## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AEARO TECHNOLOGIES LLC, *et al.*,[1] | ) | Case No. 22-02890-JJG-11 |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DECLARATION OF
## JOHN R. CASTELLANO IN SUPPORT OF THE
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, John R. Castellano, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of Aearo Technologies LLC (together with the above-captioned debtors and debtors-in-possession, the "Debtors"),[2] a limited liability company incorporated under the laws of Delaware.

2.      I am a Managing Director of AlixPartners, LLP, an affiliate of AP Services, LLC (collectively, "AlixPartners").  Pursuant to an agreement with the Debtors, AlixPartners agreed to provide personnel to the Debtors to assist it with certain functions.  I was appointed Chief Restructuring Officer of Aearo Technologies LLC and each of the Debtors on July 25, 2022.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' First Day Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief*, filed contemporaneously herewith.  The location of the Debtors' service address for the purposes of these chapter 11 cases is:  7911 Zionsville Road, Indianapolis, Indiana 46268.

[2]     In addition, the Debtors are direct parents and/or subsidiaries, as applicable, of certain non-U.S. entities that are not debtors in these chapter 11 cases (such entities, the "Aearo Non-Debtors").  The Aearo Non-Debtors are: (1) Aearo Trading (Shenzhen) Co. Ltd. (a wholly-owned subsidiary of Aearo Technologies LLC); (2) Aearo Technologies de Baja, S.A. de C.V. (99% ownership by Aearo Technologies LLC and 1% ownership by Aearo LLC); (3) Aearo Canada Limited / Aearo Canada Limitee (a wholly-owned subsidiary of Cabot Safety Intermediate LLC); and (4) Aearo Technologies de Mexico, S.A. de C.V., (99.998% ownership by Aearo Mexico Holding Corp. and .002% ownership by Cabot Safety Intermediate LLC).

3.      I hold a bachelor's degree in Accounting from DePaul University and a master's degree in Management, Finance, and Strategy from the Kellogg School of Management at Northwestern University.  I have over twenty-six years of financial restructuring and bankruptcy-related experience and over twenty-four years of experience with AlixPartners.  I have served as a Managing Director in AlixPartners' Turnaround & Restructuring Group since 2007.  Prior to joining AlixPartners, I worked at Ernst & Young LLP in its Assurance practice as an auditor, and in its Consulting practice focusing on restructuring advisory services.  I have served as Chief Restructuring Officer (or in an equivalent role) in numerous large-scale corporate restructurings, including: *In re Footprint Power Salem Harbor Development LP*, No. 22-10239 (MFW) (Bankr. D. Del. 2022); *In re Alpha Latam Management, LLC*, No. 21-11109 (JKS) (Bankr. D. Del. 2021); *In re Lonestar Resources US Inc.*, No. 20-34805 (DRJ) (Bankr. S.D. Tex. 2020); *In re McDermott International, Inc*., No. 20-30336 (DRJ) (Bankr. S.D. Tex. 2020); and *In re Aegerion Pharmaceuticals, Inc.*, No. 19-11632 (MG) (Bankr. S.D.N.Y. 2019).

4.      Since May 2022, I and the AlixPartners team have worked closely with the Debtors and their management team on contingency planning with respect to a potential chapter 11 filing. As a result of my role and experience with the Debtors, my review of relevant documents, and my discussions with other individuals who manage the Debtors' day-to-day business operations and affairs, I am generally familiar with the Debtors' business, financial affairs, and books and records. I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and to provide support for the Debtors' petitions for relief under title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and related first day motions.

5.      Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge of the Debtors' operations, finances, and employees, as well as information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management team and their advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations, financial affairs, and restructuring initiatives.  I am over the age of eighteen and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

## **Introduction**

6.      The Debtors filed these chapter 11 cases to reorganize a business with healthy operations that has become saddled with unsustainable tort liabilities.  To achieve this reorganization, the Debtors intend to utilize the tools available under the Bankruptcy Code to provide a full recovery to tort claimants who are entitled to compensation, while endeavoring to ensure that all general unsecured creditors will receive a 100% recovery in the chapter 11 cases.

7.      Under the brand name Aearo Technologies, the Debtors manufacture and sell custom noise, vibration, thermal, and shock protection solutions, primarily serving the aerospace, commercial vehicle, heavy equipment, and electronics industries.  The Debtors have 330 employees and generated approximately $108 million in direct sales in 2021.  The Debtors are headquartered in Indianapolis, Indiana, where they have been based for over 40 years and where they have their main operating plant.  In 2008, the Debtors were acquired by 3M Company (together with its affiliates other than the Debtors and the Aearo Non-Debtors, "3M") in a stock purchase and remain a wholly-owned subsidiary of 3M.  3M and its other affiliates are not debtors in these chapter 11 cases.

A.    **Tort Liabilities**

8.      In recent years, the Debtors have been the subject of a flood of tort litigation. Specifically, five of the Debtors, plus 3M, are the named defendants in what has become by far the largest multidistrict litigation in United States history, in which over 230,000 claims are pending against the Debtors in the Northern District of Florida (the "MDL").  The claims generally allege hearing injuries arising from the sale of noise-reduction earplugs, known as "Dual-Ended Combat Arms — Version 2" earplugs ("Combat Arms," and claims related thereto, including any Earplug Liabilities,[3] the "Combat Arms Claims"), which were historically manufactured by the Debtors.  For over a decade, the Combat Arms product received accolades from soldiers for its ability to offer hearing protection while preserving lifesaving situational awareness.  The Debtors began selling the earplugs in significant quantities in the early 2000s, and the Debtors and 3M continued to manufacture the earplugs after the 2008 acquisition until they discontinued the product in 2015.  The earplugs were designed in close collaboration with, and were historically sold to, the United States military, and the Debtors understand that the vast majority of plaintiffs in the MDL are military veterans.[4]  The litigations commenced in December 2018, when a military veteran filed an individual lawsuit, and were consolidated into the MDL in April 2019.

9.      The Combat Arms litigation remains in the early stages.  Only 19 of the over 230,000 claims included in the MDL have been tried to a jury verdict.  Appeals are pending on several issues, including whether the Debtors can assert the "government contractor" defense,

---

[3]     As defined in the Funding Agreement, "Earplug Liabilities" means any Liability of any Company Party, whether existing now or arising in the future, based in whole or in part on any conduct or circumstance arising out of, relating to or in connection with dual-ended earplugs, including Dual-Ended Combat Arms – Version 2 earplugs, ARC Plug earplugs, and AO Safety Indoor Outdoor Range Earplugs, sold or manufactured by any Company Party, under any trade name, including any Liability pursuant to any Proceedings relating to any of the foregoing.

[4]     The Combat Arms and consumer versions of the earplugs were also sold commercially to non-military customers beginning around 2000.

which I understand may be a total defense to liability.  Discovery has not commenced as to the vast majority of claims, and the Debtors lack basic substantiating information regarding the vast majority of the claims pending in the MDL.  The Debtors and 3M have vigorously defended the litigation and believe the Combat Arms earplugs are effective and safe when used properly. Initial trials have resulted in disparate outcomes, ranging from complete defense verdicts to individual plaintiff's verdicts of as much as $77.5 million.  Other bellwether plaintiffs dismissed their cases before trial.  According to one plaintiff's attorney, the MDL poses an exposure risk of over $1 trillion.  3M has already spent approximately $347 million in fees and costs defending the Combat Arms claims to date.  As set forth in greater detail in the Informational Brief,[5] the Debtors submit that the MDL cannot provide fair and efficient resolution of the Combat Arms Claims. The Debtors believe that these chapter 11 cases present the optimal path to resolve the Combat Arms Claims and compensate claimants who are entitled to compensation in an expeditious fashion.

10.    The Debtors are also subject to a smaller number of claims related to alleged personal injury from workplace exposures to asbestos, silica, coal mine dust, or other occupational dusts in connection with the use of the Debtors' mask and respirator products (the "Respirators"). As of the filing of these chapter 11 cases, there are a number of mask and respirator claims pending against the Debtors, and the Debtors have a $41 million accounting accrual for both product liabilities and defense costs related to their mask and respirator claims (such claims, the "Respirator Claims").

---

[5]    *See Informational Brief of Aearo Technologies LLC* (the "Informational Brief").

**B.      Chapter 11 Cases**

11.      Through these chapter 11 cases, the Debtors seek to establish and fund one or more trusts that will provide a full recovery to tort claimants who are entitled to compensation. Absent the filing of the chapter 11 cases, the Debtors believe that litigation related to Combat Arms and Respirators could go on for decades, continue to consume millions of dollars in defense costs annually, and continue to result in highly disparate outcomes for plaintiffs. The Debtors believe that the tools available under the Bankruptcy Code will allow for a faster and more efficient resolution of claims in a centralized forum, the establishment of a fully-funded trust for the benefit of claimants, and the establishment of procedures that ensure equitable recoveries to claimants entitled to compensation. To that end, the Debtors are prepared to negotiate a consensual plan of reorganization with affected stakeholders.

12.      To ensure that they can achieve these goals, on July 25, 2022, the Debtors entered into a funding and indemnification agreement attached hereto as **Exhibit B** (the "Funding Agreement") with 3M under which 3M has agreed to contribute $240 million to fund administration of these chapter 11 cases and $1 billion to a trust to ensure claimants entitled to compensation receive payment. If necessary to achieve a resolution, 3M has committed to provide additional funding. Under the Funding Agreement, 3M has also committed to continue certain shared services traditionally provided by 3M and to fund, among other things, certain disbursements traditionally made by 3M on the Debtors' behalf, the Debtors' costs and expenses related to these chapter 11 cases, and other liabilities under a plan of reorganization. In exchange, the Debtors have agreed to indemnify 3M and its affiliates for all applicable tort claims, as well as defense costs related thereto. In 2021, 3M's net sales exceeded $35 billion, up from approximately $32 billion in 2020. In 2021, pre-tax income was $7.2 billion, up from $6.8 billion in 2020. The Funding Agreement therefore ensures that these chapter 11 cases will be fully funded,

including administrative expenses, general unsecured claims, and any ultimate plan trust. The Debtors have no repayment obligation to 3M pursuant to the Funding Agreement.

13.     The Debtors' business is managed by their boards of directors, including two disinterested directors, Roger Meltzer and Jeffrey Stein, to whom the boards have delegated authority to decide any conflicts matters.  In April 2022, the Debtors retained Kirkland & Ellis LLP ("K&E") to assist in contingency planning for potential chapter 11 proceedings to address their tort liabilities.  K&E also represents the Debtors and 3M in the MDL.  In May 2022, the Debtors retained AlixPartners to assist with contingency planning.  On July 23, 2022, the disinterested directors approved entry into the Funding Agreement, which was negotiated between the Debtors, at the direction of the disinterested directors in consultation with their conflicts counsel, McDonald Hopkins LLC, and 3M, in consultation with their counsel, White & Case LLP. On July 25, 2022, the Debtors' boards approved the commencement of these chapter 11 cases and appointed me as CRO of the Debtors.

14.     Contemporaneously herewith, the Debtors filed an adversary complaint and a motion seeking (i) confirmation that the commencement or continued prosecution of Combat Arms Claims against 3M while these chapter 11 cases remain pending violates the automatic stay imposed by section 362(a) of the Bankruptcy Code, (ii) a preliminary injunction pursuant to sections 105 and 362 of the Bankruptcy Code prohibiting the Stay Defendants from continuing to prosecute the Combat Arms Claims against 3M while the chapter 11 cases remain pending, and (iii) temporary restraining order prohibiting the prosecution of certain Combat Arms Claims against 3M pending an order on the Debtors' request for a preliminary injunction (as more fully set forth in those papers).

15. The Debtors have also filed various motions and pleadings seeking "first day" relief (collectively, the "First Day Motions") to ensure a smooth transition into chapter 11. I am familiar with the contents of each First Day Motion, and I believe that the relief sought therein (a) is necessary to enable the Debtors to continue their business operations in the ordinary course, (b) constitutes a critical element in achieving successful confirmation of a chapter 11 plan, (c) is necessary to enable the Debtors to fairly and efficiently manage the Combat Arms Claims in these chapter 11 cases, and (d) best serves the interests of the Debtors, their estates, and their stakeholders. The facts set forth in each First Day Motion are incorporated herein by reference.

16. To familiarize the Court with the Debtors, their business, and the circumstances leading to these chapter 11 cases, I have organized this Declaration as follows:

- **Part I** provides a general overview of the Debtors' corporate history, business, corporate structure, and objectives in commencing these chapter 11 cases.

- **Part II** summarizes the relief requested in and the evidentiary support for the First Day Motions.

## PART I:
## CORPORATE BACKGROUND AND HISTORY

### A.    The Debtors' Corporate History

#### 1.    Origins of the Debtors

17. In the 1940s, American Optical Company began manufacturing and selling respirators as part of its industrial safety business. In 1967, the American Optical Corporation, an entity ultimately owned by the Warner-Lambert Company, acquired the assets of American Optical Company. Thereafter, in 1982, a company called A.O. Holding Corporation acquired Warner-Lambert Company's interests in American Optical Corporation. In 1990, Cabot Safety Corporation purchased the assets of American Optical Company's safety division from American Optical Corporation. The Cabot Safety Corporation entities holding the

American Optical Corporation's assets then underwent a series of name changes, resulting in the name "Aearo," which reflected the combination of the American Optical Company's safety products with Cabot Safety Corporation's existing energy absorbing resin (or "E-A-R") technologies. The Debtors were then acquired by Vestar Capital Partners through a management buyout in 1995, and were subsequently sold to Bear Stearns Merchant Bank in 2004. Two years later, in 2006, Bear Stearns Merchant Bank sold the Debtors to Permira, a private equity firm, for approximately $765 million. Finally, as discussed in further detail in the subsequent section, 3M acquired the Debtors in 2008.

18.    In the late 1990s, the U.S. military was searching for hearing protection to offer protection from high-level impulse noises—like gunfire—while still allowing the user to hear lower-level sounds—like speech—with limited interruption. To meet this need, the Debtors, in close collaboration with the military and expert scientists at the French-German Institute de St. Louis, designed and developed the Combat Arms earplugs, which the military then approved for purchase. Extensive testing by the Debtors, the military, and independent labs and other organizations confirmed that the Combat Arms worked as intended.

19.    At the time of the Debtors' acquisition by 3M, over half of the Debtors' sales were in the hearing-protection space, including significant sales of both passive hearing protective gear (*i.e.*, ear plugs and earmuffs for industrial use) and active hearing protective gear (*i.e.*, stronger protective gear used in the industrial, military, and aerospace markets). As discussed further herein, certain members of the military who utilized the Combat Arms have asserted claims against the Debtors and 3M that gave rise to these chapter 11 cases.

### 2.    3M's Acquisition of the Debtors

20.    Founded in 1902 as the Minnesota Mining and Manufacturing Company in Two Harbors, Minnesota, 3M is an iconic American multinational technology and manufacturing

company.  3M grew exponentially through the twentieth century to become one of America's largest manufacturing firms, becoming one of just thirty companies included in the Dow Jones Industrial Average in 1976.  3M achieved this massive growth through innovation—developing products across a wide range of markets including pharmaceuticals and chemicals, digital imaging and sound technology, and office supply and consumer goods.  3M currently operates through four business groups: (1) the Safety and Industrial Business Group, (2) the Transportation and Electronics Business Group, (3) the Health Care Business Group, and (4) the Consumer Business Group.

21.     3M's business remains strong, with over $8.8 billion in sales reported through the first quarter of 2022, roughly matching their sales from the same period in 2021.  In 2021, 3M's net sales exceeded $35 billion, up from approximately $32 billion in 2020.   In July 2022, 3M announced its intention to spin off its Health Care Business Group into an independent, publicly-traded company (such transaction, the "Spin-Off").  I understand that 3M anticipates that the Spin-Off will close by the end of 2023.  The Health Care Business Group accounted for approximately $9.1 billion of 3M's total sales (over $35 billion) in fiscal year 2021.  Based on my review of the relevant financial information, following the Spin-Off, 3M will remain well-positioned to meet its funding obligations set forth in the Funding Agreement.

22.     3M acquired the Debtors in April 2008 through a stock purchase for approximately $1.2 billion.  The acquisition was initiated through the Safety and Industrial Business Group, with the goal of creating synergies with 3M's existing occupational health and safety business by adding the Debtors' hearing, eyewear, and fall protection product lines.  At the time of the acquisition, the Debtors were already manufacturing and distributing the Combat Arms earplugs that would ultimately lead to the Combat Arms Claims necessitating these chapter 11 cases.  As expressed on

the chart below, of the approximately $31 million in lifetime sales of the Combat Arms, the vast majority (approximately 80%) occurred prior to 3M's acquisition of the Debtors.



23.    In the first two years following the acquisition, the Debtors' business remained independent from 3M.  In 2010, the component of the Debtors' business responsible for the significant majority of its earplug sales was transferred upstream to 3M.

### 3.    Corporate Structure and Governance

24.    The Debtors consist of seven entities that are each ultimately owned by 3M Company.  Each Debtor entity has its own board of directors.

25.    Before commencing these chapter 11 cases, the Debtors appointed Roger Meltzer and Jeffrey Stein (the "Disinterested Directors") to the boards of directors of each filing entity (the "Boards").  Messrs. Meltzer and Stein have experience serving as disinterested directors, and neither has any prior affiliations with the Debtors or 3M.  Messrs. Meltzer and Stein have been delegated broad decision-making authority with respect to matters that may constitute a conflict between the Debtors and 3M.

26. The Disinterested Directors have also retained McDonald Hopkins LLC as conflicts counsel. A simplified version of the Debtors' corporate organizational chart is set forth below.



27. Further, on July 25, 2022, Aearo Technologies LLC appointed me as the Chief Restructuring Officer. The Debtors also engaged K&E and Ice Miller LLP as legal counsel to advise the Boards as to the potential tools to address the Debtors' tort liabilities, including through a chapter 11 process.

**B.      The Debtors' Operations**

**1.      Business Operations**

28.      The Debtors discontinued the Combat Arms in 2015 and have since shifted their business away from production of earplugs and towards other energy absorption products. The Debtors are market leaders in the energy control space, having pioneered new treatment techniques and developed proprietary, high-performance materials that control unwanted noise, vibration, shock, and thermal energy.  The Debtors manufacture and sell these materials directly to original equipment manufacturers and other customers in the aerospace, commercial vehicles, electronics, and power generation industries, as well as supplying components to the construction, agriculture, medical devices, and specialty vehicles spaces.  The energy absorption components manufactured by the Debtors generally fall into one of five categories: (1) damping materials, (2) isolation materials, (3) acoustic absorbers, (4) barriers, and (5) thermal control materials.

29.      These energy absorption components are implemented throughout the interiors of heavy machinery, including commercial trucks and aircraft, to ensure that such vehicles function both safely and in a user-friendly manner.





30.     The Debtors are headquartered in Indianapolis, Indiana, with additional U.S. offices and manufacturing facilities located in Newark, Delaware.  Aearo Technologies LLC directly employs 330 individuals, all on a full-time basis.  Of the 330 employees, 172 are located in Indianapolis (the Debtors' global headquarters and home to their largest equipment testing facility) with additional employees employed at the Debtors' facilities in Newark.  The Debtors' principal tangible assets, including over 247,800 square feet of real property, are located in Indianapolis.

31.     The Debtors' sales, which amounted to approximately $126 million in 2021, generally occur through Aearo Technologies LLC.  These sales primarily come in the form of "direct" sales from Aearo Technologies LLC to third-party consumers and manufacturers.  Aearo Technologies LLC completed approximately $108 million in direct sales in fiscal year 2021.  The Debtors maintain long-term supply contracts with certain of their largest direct sales customers, which include original equipment manufacturers in the commercial vehicle and aerospace industries.  By contrast, the Debtors' other customers ordinarily purchase products through purchase orders without entering into long-term contractual arrangements with the Debtors.  The remainder of the Debtors' sales (approximately $18 million in fiscal year 2021) are

"indirect" sales through which the Debtors sell products and raw materials to 3M. 3M then combines those products and raw materials supplied by the Debtors into finished goods and sells them to 3M's customers. For example, the Debtors provide a significant quantity of raw foam material to 3M, which 3M then uses to manufacture certain of its products.

32. While the Debtors utilize 3M's broader corporate structure for functions such as finance, treasury, information technology and other related services, the Debtors are operated by their own management team, cultivate sales relationships, develop and design products, and control their own affairs in many respects. The Debtors are staffed with their own application and design engineering teams, commercial development, logistics, manufacturing, marketing, and quality organizations. The Debtors are solely responsible for delivering their business plan. The Debtors have no funded debt obligations.

33. The Debtors and 3M are parties to a shared services agreement and accompanying IP agreement entered into shortly after 3M's acquisition of the Debtors (the "Shared Services Agreement"). The Shared Services Agreement governs, among other things: (a) laboratory, technical assistance, and manufacturing services (related to R&D, manufacturing, and other operations); (b) selling, marketing, and general and administrative services (including HR, training, IT support, sales and marketing, advertising, customer relationship management); and (c) functional services (including purchasing, finance/accounting, insurance, import/export, legal, inventory management, HR, and supply chain management). Pursuant to the Shared Services Agreement, any Debtor-provided services are to be reimbursed at cost plus 10 percent, with 3M-provided services to be reimbursed at cost, each in accordance with accepted procedures for invoicing, recharging, or allocating costs by 3M and its affiliates. As described in further detail below, the Funding Agreement provides that any existing shared services arrangements in place

between 3M and the Debtors immediately prior to the Petition Date are to continue throughout the duration of these chapter 11 cases. Pursuant to the Funding Agreement, the Debtors will not be required to pay for any shared services during the pendency of these chapter 11 cases. The Debtors and 3M are also party to a number of ancillary intercompany agreements governing, among other things, treatment of proprietary information, intellectual property, research and development, and marketing and sales.

### 2.    Insurance Policies

34.    3M and the Debtors share insurance and reinsurance policies that provide coverage for claims and defense costs related to the Combat Arms Claims. The Debtors are insured under many primary, umbrella, and excess liability insurance policies, including commercial general liability policies that cover defense and indemnity costs related to the Combat Arms Claims. These include several policies pre-dating 3M's acquisition of the Debtors (the "Aearo Legacy Program") that collectively provide approximately $500 million in coverage, not including any supplemental defense coverage. Additionally, the Debtors have had insurance coverage since the April 1, 2008, acquisition under 3M's product liability and other insurance programs, including dozens of primary, umbrella and excess policies (the "3M Program").

35.    Critically, with respect to the 3M Program, commercial general liability policies covering the 2018-2019 policy period—which include 46 separate policies comprising 18 layers of coverage[6]—are shared between the Debtors and 3M. The policies explicitly provide retroactive coverage for Aearo, back to the April 1, 2008, acquisition, and Aearo is listed as a named insured alongside 3M. The combined aggregate limit of 3M's 2018-19 commercial general liability

---

[6]    A list of these policies is attached hereto as **Exhibit C**.

policies is more than $1.05 billion—more than double the coverage available under the Aearo Legacy Program.

36.     3M—on behalf of itself and the Debtors—provided notice of the Combat Arms claims to the following insurers: (1) the Debtors' primary and excess insurers for policy periods covering 1997 to 2008; and (2) 3M's tower policy insurers and reinsurers for a policy period covering 2018 to 2019.  In those notice letters, 3M and the Debtors requested coverage, including for litigation costs, for their defense of personal injury allegations and other covered claims relating to the Combat Arms Claims.  Although none of the insurers has acknowledged its coverage obligations, 3M and the Debtors maintain that they are entitled to coverage for the Combat Arms Claims under these policies.

### 3.     Tort Claims and Liability Arrangements

#### a.     Combat Arms

37.     The Debtors and 3M are subject to liabilities related to the sale and use of the Combat Arms, which broadly fall into two categories: (1) claims alleging that the design of the Combat Arms prevented users from obtaining a proper fit and seal when inserting the devices into their ear canals, allowing damaging sounds to enter; and (2) claims alleging that the Debtors failed to warn users and/or the military of the alleged defects and/or risks associated with use of the Combat Arms.  The Combat Arms Claims represent the vast majority of the tort claims asserted against the Debtors.

38.     As set forth in greater detail in the Informational Brief, the Debtors are named defendants in the MDL, which I understand has swelled to over 230,000 personal injury claims as

of the Petition Date.[7]  I further understand that the MDL is the largest in the history of the United States, surpassing most of its predecessor and contemporary MDLs by orders of magnitude. The Combat Arms MDL now has more than twice as many claims as the other 182 pending multi-district litigations in the United States *combined*.  The Debtors believe that the sheer size of the MDL makes it unmanageable in the tort system and that the MDL docket is full of unvetted claims, thereby preventing the Debtors from cultivating reasonable settlements with claimants. For this reason, the Debtors believe that most claimants are no closer to any compensation determination than they were before the MDL was formed.

39.     Further, the Debtors believe that the MDL bellwether trial process similarly failed to provide reliable information regarding the value of the Combat Arms Claims.  Of the twenty-seven plaintiffs whose claims proceeded in the bellwether trials, the claims of eight plaintiffs were dismissed before trial, and six trials resulted in complete defense verdicts.  And those bellwether trials that resulted in plaintiff verdicts provided minimal information about value or resolution given that juries awarded plaintiffs disparate outcomes, with individual verdicts ranging from $1.7 million to as much as $77.5 million.

40.     The Debtors and 3M have expended significant resources in defense of the Combat Arms Claims.  Defense of the Combat Arms Claims has cost approximately $347 million in fees and costs to date.  This year alone, 3M spent approximately $47.77 million in attorneys' fees and costs in the first quarter of 2022, and approximately $74.5 million in the second quarter, which amounts to approximately $4.7 million spent per week.  For the remainder of 2022, 3M projects that it will spend approximately $99.8 million on attorneys' fees and costs ($56.8 million and $43

---

[7]     In addition, approximately 2,000 claims related to the Combat Arms or their commercial equivalents are currently pending in state court in Minnesota.

million in the third and fourth quarters, respectively), which equals approximately $3.8 million per week.  These projections assume that the MDL court does not constitute a Wave 4 and that the only additional trial in 2022 will be the August 2022 trial scheduled in the Minnesota state court actions.  These projections do not account for the MDL Wave 1 case trial currently scheduled for October 24, 2022.

### b.  Respirators

41.     In addition, the Debtors are currently defending a number of lawsuits alleging workplace exposure to asbestos, silica, coal mine dust, and other occupational dusts resulting from the manufacture and sale of Respirators.  The Respirator Claims largely fall into one of four categories:  (1) claims alleging that the design of certain respirators precluded an adequate face fit; (2) claims asserting injuries arising from the allegation that respirators were never tested within mines, where certain harmful exposures were alleged to occur; (3) claims alleging that the electrostatic filter would break down in a humid mine or other workplace conditions; and (4) claims alleging that the Debtors failed to provide adequate warning as to the potential risks associated with use of the Respirators.

42.     Responsibility for legal costs as well as for settlements and judgments associated with the Respirator Claims is currently shared in an informal arrangement among the Debtors, Cabot Corporation, American Optical, and a subsidiary of the Warner-Lambert Company and their respective insurers (the "Payor Group").  Liability is allocated among the parties based on the number of years each company sold respiratory products under the "AO Safety" brand and/or owned the Safety Division of American Optical and the alleged years of exposure of the individual plaintiff.

43.     The Debtors' share of the contingent liability is further limited by an agreement entered into between the Debtors and Cabot Corporation on July 11, 1995.  This agreement

provides that, so long as the Debtors pay a quarterly fee of $100,000 to Cabot Corporation, Cabot Corporation will retain responsibility and liability for, and indemnify the Debtors against, any product liability claims involving exposure to asbestos, silica, or silica products for respirators sold prior to July 11, 1995. Because of the difficulty in determining how long a particular respirator remains in the stream of commerce after being sold, the Debtors and Cabot Corporation have applied the agreement to claims arising out of the alleged use of respirators involving exposure to asbestos, silica, or silica products prior to January 1, 1997. With these arrangements in place, the Debtors' potential liability is limited to exposures alleged to have arisen from the use of respirators involving exposure to asbestos, silica, or silica products on or after January 1, 1997. To date, the Debtors have elected to pay the quarterly fee.

44.     As of March 31, 2022, the Debtors had accruals of $41 million for product liabilities and defense costs related to current and future asbestos, silica-related, and coal mine dust claims. This accrual represents the Debtors' best estimate of their probable loss and reflects an estimation period for future claims that may be filed against the Debtors approaching the year 2050.

### 4.     Funding Agreement

45.     In the months prior to the commencement of these chapter 11 cases, the Debtors took proactive steps to determine if they could address their Combat Arms and other liabilities through chapter 11. Following the Disinterested Directors' appointment in June 2022, the Debtors, acting at the direction of the Disinterested Directors, began negotiating the terms upon which 3M would agree to fund the Debtors' chapter 11 cases, including the professional fees expected to be incurred and the ultimate funding of a claims trust, while also remaining independent from 3M before and during a chapter 11 case.

46.     Against this backdrop, the Debtors, at the direction of the Disinterested Directors, and 3M determined to enter into a funding agreement pursuant to which 3M would fund the

Debtors' chapter 11 cases.  The Debtors sought to secure funds from 3M to satisfy operating expenses and administrative and professional fees, as well as additional proceeds to fund a claims trust, all in exchange for the Debtors' commitment to indemnify 3M for all liabilities related to the Combat Arms Claims and Respirator Claims.  And, in light of the shared services historically provided by 3M for the benefit of the Debtors, the Debtors also proposed to 3M that 3M commit to continue such services in the ordinary course going forward.

47.     After several rounds of negotiations, during which 3M was represented by White & Case LLP as counsel and the Debtors were represented by McDonald Hopkins LLC as conflicts counsel, the Debtors and 3M agreed to the Funding Agreement attached hereto as **Exhibit B**.  The key terms of the Funding Agreement[8] include the following:

- ***Consideration from 3M to the Debtors***. 3M agrees to provide cash upfront to fund the Debtors' operations and their chapter 11 cases in the amount of $5.0 million, which was funded on July 25, 2022 (the "Initial Payment"). 3M agrees further to fulfill Funding Requests for Permitted Funding Uses, including, among other things, the Debtors' operations, chapter 11 cases, and one or more Trusts for Earplug Liabilities and Respirator Liabilities.  3M will continue, and will cause its Payor Affiliates to continue, to provide the Shared Services to the Debtors.

- ***Consideration from the Debtors to 3M***. The Debtors agree to indemnify 3M and its Payor Affiliates for all Earplug Liabilities and Respirator Liabilities.

- ***Continuation of Existing Shared Services Arrangement***. 3M will continue, and will cause its Payor Affiliates to continue, to provide the Shared Services to the Debtors.  The Debtors will not be required to make payments to 3M on account of the Shared Services during the pendency of the chapter 11 cases.

- ***Funding***. In addition to the Initial Payment, 3M commits $1.24 billion under the terms of the Funding Agreement, which commitment includes:
  - $1.0 billion to fund one or more Trusts; and
  - $240.0 million to administer the chapter 11 cases.

---

[8]     Capitalized terms used in this summary but not otherwise defined in the First Day Declaration shall have the meanings ascribed to them in the Funding Agreement.  To the extent that there is any inconsistency between this summary and the Funding Agreement, the Funding Agreement shall control.

These commitments are not a cap. Through the Funding Agreement, 3M has committed to fund *any* Permitted Funding Use, even if it exceeds the foregoing commitments.

- ***Permitted Funding Uses***. The following obligations are considered Permitted Funding Uses under the Funding Agreement:

  - Operating Costs: Operating costs and costs associated with the administration of the chapter 11 cases;

  - Liability/Defense Costs: (a) outside of the chapter 11 cases, payments made on account of the Earplug Liabilities and Respirator Liabilities; (b) following the commencement of the chapter 11 cases, funding of one or more Trusts; (c) any Liability for any other Causes of Action allowed or deemed allowed under a Plan, other than the Earplug Liabilities or the Respirator Liabilities; and (d) any ancillary/defense costs related to the foregoing;

  - Liability owed to 3M: Any liabilities of the Debtors owed to 3M or any Payor Affiliate;

  - Enforcement Costs: Costs incurred by the Debtors in enforcing the Funding Agreement; and

  - Indemnification Costs: Costs incurred to pay any indemnification or other obligations owing to any managers, directors, or officers of a Debtor.

  The foregoing constitute Permitted Funding Uses only to the extent the Debtors' available cash (including cash expected to be received from the Debtors' assets and insurance recoveries) is projected to be insufficient to satisfy such liabilities in full while maintaining the Minimum Balance.

- ***No Requirement of Repayment***. The Debtors have no requirement to return or repay any Payment made by 3M under the Funding Agreement.

- ***No Case Controls***. In exchange for 3M's funding commitment, 3M received no other consent rights or controls over the chapter 11 cases. There are no milestone controls, express consent rights over any plan of reorganization or assignment of the Funding Agreement to a Trust, or control over funding decisions.

- ***Conditions to Funding***. Conditions to funding include the following: (a) that there is no continuing breach by the Debtors of their covenants under the Funding Agreement in any material respect, including their covenants to (i) only request and use payments for Permitted Funding Uses, (ii) honor their indemnification obligations to 3M and its Payor Affiliates in all material respects,

subject to the automatic stay, and (iii) provide a Budget every two weeks; and (b) that the Debtors' representations and warranties remain true in all material respects.

48.     Critically, the Funding Agreement will enable the Debtors to fund these chapter 11 cases and the claims trust to resolve the significant potential Combat Arms and Respirator Claims faced by the Debtors.  The Funding Agreement provides the Debtors with an ability to advance these chapter 11 cases to claims estimation, plan confirmation, and emergence, and provides a potential source of recovery for any Combat Arms and Respirator claimants determined to be entitled to compensation.

49.     The Debtors believe they have sufficient assets, including cash available under the Funding Agreement, (a) to fund a claims trust that will be governed by procedures that efficiently and fairly review claims and compensate all tort claimants, and (b) otherwise satisfy the requirements necessary to qualify for section 524(g) and/or 105(a) relief.  While 3M has funded the costs of defending the tort litigation to date, there was no guarantee that 3M would continue to fund these costs until 3M agreed to provide further funding pursuant to the Funding Agreement. In the absence of such funding, the Debtors would lack sufficient assets to mount a defense of the tort claims while continuing to operate their business.

**5.     Decision to Commence These Chapter 11 Cases**

50.     The Debtors' decision to commence these chapter 11 cases stems from the lack of an alternative mechanism to efficiently and equitably address their alleged liabilities related to the sale and use of the Combat Arms and Respirators.  After diligently considering the cost, burden, uncertainty, and anticipated duration of continuing with the Debtors' ongoing litigation through the tort system, the Debtors determined that the filing of these chapter 11 cases was prudent and

necessary.  As detailed above, 3M has already expended hundreds of millions of dollars defending the MDL and various litigations related to the Combat Arms and Respirators.

51.    The Debtors' goal in these cases is to negotiate, obtain approval of, and ultimately consummate a plan of reorganization that would, among other things, (a) establish and fund a claims trust to resolve and pay all Combat Arms Claims and Respirator Claims against the Debtors, (b) enable the Debtors' business to continue thriving without the overhang of legacy liabilities, and (c) provide for the issuance of an injunction that will permanently protect the Debtors and 3M from further claims related to Combat Arms and Respirators for which the Debtors and 3M may otherwise have had legal responsibility, pursuant to sections 105(a) and 524(g) of the Bankruptcy Code.  Confirmation of the plan of reorganization will enable the Debtors to focus their energies on further growing their otherwise healthy businesses, to the ultimate benefit of their stakeholders, all while providing an equitable mechanism for addressing their myriad tort liabilities and ensuring a more timely distribution to Combat Arms and Respirator claimants than they would otherwise hope to receive in the tort system.

52.    The Debtors are prepared to commit the necessary resources to reach an agreement with claimants on a fair and equitable plan of reorganization as soon as possible.  The Debtors also plan to file a motion in the near term to schedule an estimation trial to determine the estimated amount of the Debtors' Combat Arms and Respirator liabilities, so they can utilize a key tool of sections 524(g) and 105(a) of Bankruptcy Code in the event the parties are unable to reach a settlement.  The Debtors look forward to engaging in good-faith negotiations to reach a consensual resolution of these chapter 11 cases with representatives for tort claimants as soon as they are appointed and willing to begin discussions.

**PART II**
**EVIDENTIARY SUPPORT FOR THE FIRST DAY MOTIONS**

53. Along with this Declaration, the Debtors have filed the First Day Motions, seeking orders granting various forms of relief intended to facilitate the efficient administration of these chapter 11 cases. The following motions comprise the First Day Motions:

- *Debtors' First Day Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Administration Motion");

- *Debtors' First Day Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* (the "Case Management Motion");

- *Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Maintain Existing Business Forms and Books and Records, and (C) Perform Postpetition Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Claims Among the Debtors, and (III) Granting Related Relief* (the "Cash Management Motion");

- *Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Specified Trade Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief* (the "Trade Claimants Motion");

- *Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Compensation, and Benefit Obligations and (B) Continue Employee Compensation and Benefits Programs, and (II) Granting Related Relief* (the "Wages Motion");

- *Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Continue to Pay Certain Brokerage Fees, and (C) Renew, Supplement, Modify, or Purchase Insurance and Reinsurance Coverage, (II) Approving Continuation of their Surety Bond Program, and (III) Granting Related Relief* (the "Insurance Motion");

- *Debtors' First Day Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Approving the Debtors' Proposed Procedures for Resolving Additional*

*Assurance Requests, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (IV) Granting Related Relief* (the "<u>Utilities Motion</u>");

- *Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* (the "<u>Taxes Motion</u>");

- *Debtors' Application for Entry of an Order Authorizing Employment of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent* (the "<u>Kroll Retention Application</u>");

- *Debtors' Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, and (II) Granting Related Relief* (the "<u>Schedules Extension Motion</u>"); and

- *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File One List of the Top Law Firms Representing the Largest Numbers of Tort Plaintiffs Asserting Claims Against the Debtors, (II) Authorizing the Debtors to File One Consolidated Creditor Matrix, (III) Authorizing the Listing of Addresses of Counsel for Tort Claimants in the Creditor Matrix in Lieu of Claimants' Addresses, (IV) Authorizing the Debtors to Redact Personally Identifiable Information, (V) Approving Certain Notice Procedures for Tort Claimants, (VI) Approving the Form and Manner of Notice of the Commencement of These Chapter 11 Cases, and (VII) Granting Related Relief* (the "<u>Creditor Matrix Motion</u>").

54.    I am familiar with the content and substance of the First Day Motions.  To the best of my knowledge, information, and belief, the factual statements contained in each of the First Day Motions are true and accurate.  Each such factual statement is incorporated herein by reference. I believe that the relief requested in the First Day Motions is in the best interests of the Debtors' estates and all parties interests and will allow the Debtors to operate with minimal disruption and maximum value preservation during the pendency of these chapter 11 cases.  Failure to grant the relief requested in the First Day Motions may result in immediate and irreparable harm to the Debtors and their estates.  Accordingly, for the reasons set forth herein and in each respective First Day Motion, the Court should grant the relief requested in each of the First Day Motions.

A description of the relief requested in and the facts supporting each of the First Day Motions is set forth in **<u>Exhibit A</u>** attached hereto and incorporated herein by reference.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 26, 2022

Name: John R. Castellano
Title: Chief Restructuring Officer
*Aearo Technologies LLC*