## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| AEARO TECHNOLOGIES LLC,[1] | Case No. 22-02890-JJG-11 |
| Debtor. | |

## JOINT MOTION TO DISMISS THE DEBTORS' BANKRUPTCY
## CASES PURSUANT TO BANKRUPTCY CODE SECTION 1112(b)

The Official Committee of Unsecured Creditors for Tort Claimants – Related to Use of Combat Arms Version 2 Earplugs (the "CAE Committee"),[2] the estate fiduciary for creditors injured by the Combat Arms Earplugs Version 2 ("CAEv2"), and over two hundred thousand CAEv2 claimants – veterans, active-duty servicemembers, civilian contractors, and consumers – represented by the law firms on the signature pages of this motion, hereby jointly move to dismiss these chapter 11 cases for cause under Bankruptcy Code section 1112(b).

---

[1]     The debtors and debtors-in-possession (the "Debtors") in these cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief*, entered by the Court for each consolidated Debtor [Bankr. D.I. 37–42].  The location of the Debtors' service address for the purposes of these cases is 7911 Zionsville Road, Indianapolis, Indiana 46268.

As required by Local Bankruptcy Rule B-1015-1(b)(5), this motion is being filed in identical form in each of the six cases – No. 22-02890-JJG-11, No. 22-02891-JJG-11, No. 22-02892-JJG-11, No. 22-02893-JJG-11, No. 22-02894-JJG-11, No. 22-02895-JJG-11, and No. 22-02896-JJG-11 – that are jointly administered under Lead Case No. 22-02890-JJG-11.

References to "Bankr. D.I. __" are to docket entries in the lead case.  References to "Adv. D.I. __" are to docket entries in *Aearo Technologies LLC v. Parties Listed on Appendix A to the Complaint (In re Aearo Technologies LLC)*, Adversary Proceeding No. 22-50059 (Bankr. S.D. Ind.).  References to "MDL D.I. __" are to docket entries in *In re 3M Combat Arms Earplug Prods. Litig.*, No. 19-2885 (N.D. Fla.) ("MDL").  Aside from Exhibit A hereto, references to "Ex. __" are to the trial exhibits admitted by the Court on the record at the preliminary injunction hearing.  Unless otherwise indicated, internal quotation marks and internal citations are omitted from case citations.

[2]     On August 30, 2022, the Office of the United States Trustee appointed the CAE Committee [Bankr. D.I. 393].

## I. PRELIMINARY STATEMENT

1.     From the first day of this bankruptcy, the Debtors have touted their Funding Agreement with 3M Company ("3M") as the cornerstone of these chapter 11 cases: "The Funding Agreement … ensures that these chapter 11 cases will be fully funded, including administrative expenses, general unsecured claims, and any ultimate plan trust," all with "no repayment obligation to 3M …." First Day Decl. [Bankr. D.I. 11] ¶ 12.[3]  This Funding Agreement, in turn, was directly modeled on a similar agreement between Johnson & Johnson ("J&J") and its wholly-owned subsidiary, LTL Management LLC ("LTL").  Under that agreement, the subsidiary "has a funding backstop, not unlike an ATM disguised as a contract, that it can draw on to pay liabilities without any disruption to its business or threat to its financial viability."  *In re LTL Mgmt. LLC*, ___ F.4th ___, 2023 WL 1098189, 2023 U.S. App. LEXIS 2323, slip op. at 52 (3d Cir. Jan. 30, 2023) ("*LTL*").[4]  The Debtors' lead counsel testified that the J&J / LTL "form" was the base from which the Funding Agreement here was built:

> Q:     What did Kirkland do to prepare this draft funding and indemnification agreement?
>
> A:     My understanding is that we reviewed some of the more recent funding agreements used in mass tort cases, including most notably the LTL Chapter 11 case….
>
> Q:     And how did Kirkland decide what terms to include in the funding agreement?
>
> A:     We took the LTL form.  We updated it for, among other things, names, et cetera, format, nature of the case, the identity of the debtors….  [Nov. 9, 2022 Hr'g 78:14–79:9.]

---

[3]   *See also* Funding Agreement at Recital B (describing the agreement as ensuring that each Debtor will always "have assets with a value greater than its Liabilities and will have financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of its business").

[4]   For ease of reference, a copy of the slip opinion in *LTL* is hereto as Exhibit A.

2.      Having modeled the Funding Agreement here on J&J and LTL, it is little surprise

that the Debtors have relied consistently on the lower court decisions in the LTL bankruptcy as

precedent, both in this Court and the Seventh Circuit:

- "Addressing mass torts through a legislative scheme enacted by Congress within the bankruptcy system … provides a judicially accepted means of aggregating and resolving mass tort claims." *Debtors' Motion for Declaratory and Injunctive Relief* [Adv. D.I. 2] at 4 (quoting *In re LTL Mgmt. LLC*, 637 B.R. 396, 411 (Bankr. D.N.J. 2022)).

- "Because they facilitate the core goals of the chapter 11 process, courts have granted preliminary injunctions of this nature in similar mass tort bankruptcies." *Id.* at 30 (citing *In re LTL Mgmt. LLC*, 638 B.R. 291, 322 (Bankr. D.N.J. 2022)).

- "MR. HUSNICK: "I think the best decision summarizing all of the circuit law that deals with 362, 105(a), the general equitable powers of the Bankruptcy Court really is the *LTL* decision."  Aug. 17, 2022 Hr'g Tr. at 119:6–120:1.

- "Your Honor, these arguments … have been repeatedly rejected by courts with far worse fact [patterns] than ours.  It was rejected in the *LTL* case, most notably and most recently."  *Id.* at 155:10-14.

*See also* Opening Brief for Debtors-Appellants [D.I. 29], *In re Aearo Technologies LLC*, No. 22-

2606 (7th Cir. Dec. 12, 2022) at 36-55 (relying on lower court *LTL* decisions throughout).

3.      The decision in *LTL* – reversing the lower court rulings on which the Debtors so

heavily rely and remanding with instructions to dismiss LTL's bankruptcy – knocks the props out

from under these cases and requires their dismissal.  Judge Ambro's opinion in *LTL* explains why

a solvent subsidiary's uncapped, non-recourse funding commitment from its solvent parent

company forecloses invocation of the Bankruptcy Code's extraordinary protections – even though

the subsidiary has been named as a defendant in substantial tort litigation.[5]  Tellingly, *LTL* mirrors

---

[5]      *See, e.g.*, Ex. A at 52–55 (finding that LTL's "funding backstop" necessarily means that LTL "was not in financial distress" and thus "cannot show its petition served a valid bankruptcy purpose"); *id.* at 48–51 (explaining why "LTL did not have any likely need in the present or the near-term, or even in the

*(footnote continued)*

in many ways this Court's analysis in its *Order Denying Plaintiffs' Motion for Preliminary Injunction* [Adv. D.I. 143] (the "PI Order"), which rests on the undisputed fact that "whatever liability the [CAEv2 cases] generate – in bankruptcy, outside of bankruptcy, stay in place, or no stay – Aearo can satisfy such liability by making a payment request [to 3M] under the Funding Agreement." *Id*. at 31–32.[6]

4.    Bankruptcy is powerful medicine that is reserved for entities in genuine financial distress.  *See LTL* [Ex. A] at 55 (explaining that the Code's "ability to redefine fundamental rights of third parties" means that "only those facing financial distress can call on bankruptcy's tools to do so"); *In re Scheffler*, 86 B.R. 576, 579 (Bankr. W.D. Wis. 1986) ("The Bankruptcy Code was intended to provide relief for financially distressed debtors…. In order for there to be a good faith bankruptcy filing … the debtor must need relief from financial distress.").  Where a full "funding backstop" (like the funding agreement in *LTL*, and the Funding Agreement here) "mitigates any financial distress foreseen on [the] petition date," *LTL* [Ex. A] at 55, and where a debtor does not "have any likely need in the present or the near-term, or even in the long-term, to exhaust its funding rights to pay [tort] liabilities," *id*. at 50, then bankruptcy just is not an available option – regardless of any subjective intent:

> Good intentions – such as to protect [a non-debtor parent's] brand or comprehensively resolve litigation – do not suffice …..  What counts to access the Bankruptcy Code's safe harbor is to meet its intended purposes.

---

long-term, to exhaust its funding rights to pay talc liabilities").  *See also id*. at 42 ("[M]ass tort liability can push a debtor to the brink.  But to measure the debtor's distance to it, courts must always weigh not just the scope of liabilities the debtor faces, but also the capacity it has to meet them.").

[6]    The Debtors have appealed the PI Order to the Seventh Circuit (in part in reliance on the now-reversed *LTL* precedent), but they have not challenged the proposition that non-debtor 3M is ultimately the entity that will bear the full cost of all CAEv2 liability.  Nor has 3M itself disputed this point.  To the contrary, 3M has embraced it in filings in other courts.  *See, e.g.*, Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b) [D.I. 1], *3M Company v. Christopher Aaby*, Case No. 23-90001, at 3 (11th Cir. Jan. 3, 2023) ("3M has entered into an uncapped Funding Agreement to fully, finally, and fairly resolve" the CAEv2 liability; *see also id*. ("3M has assumed financial responsibility for resolution of this matter pursuant to the uncapped Funding Agreement.").

> Only a putative debtor in financial distress can do so.  LTL was not.  Thus we dismiss its petition.

*Id*. at 18.[7]  The inquiry is concerned solely with the specific debtor(s) under the jurisdiction of the bankruptcy court (rather than any nondebtor parent or affiliate), *id*. at 43–45,[8] and the proper focus is on the situation as it existed the day the bankruptcy petition was filed (rather than any pre-funding-agreement past or hypothetical point in the unknowable future), *id*. at 46–54.[9]

5.  Here, just as in *LTL*, the Debtors were not in any financial distress when they invoked this Court's jurisdiction.  As of the petition date, 3M was and always had been the singular focus of CAEv2 litigation; the Debtors had paid not one dollar of liability or expense.  Their current and future obligations to CAEv2 creditors were 100% backstopped by 3M under the Funding Agreement, and no other circumstances necessitated reorganization.  Like the debtor in *LTL*, the Debtors here entered bankruptcy "highly solvent with access to cash to meet comfortably [their]

---

[7]  The Ninth Circuit nicely explained that lack of good faith is not akin to a *mens rea* or scienter element:

> The term "good faith" is somewhat misleading.  Though it suggests that the debtor's subjective intent is determinative, this is not the case.  Instead, the "good faith" filing requirement encompasses several, distinct equitable limitations that courts have placed on Chapter 11 filings.  Courts have implied such limitations to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws…. While the case law refers to … dismissals for "bad faith" filing, it is probably more accurate in light of the precise language of section 1112(b) to call them dismissals "for cause."

*In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994).

[8]  *LTL* explains that under *Butner v. United States,* 440 U.S. 48, 55 (1979), sole debtor LTL's status as a separate corporate entity meant that its rights and obligations had to be examined on their own, "independent of any other entity.  That means we focus on [LTL's] assets, liabilities, and, critically, the funding backstop it has in place to pay those liabilities."  Ex. A at 44.  *See also In re Wheaton Oaks Off. Partners Ltd. P'ship*, 27 F.3d 1234, 1241 (7th Cir. 1994) (similarly following *Butner*).

[9]  *LTL* emphasizes this temporal point heavily, explaining that the subsidiary was not "in financial distress *when it filed its Chapter 11 petition*," *id*. at 46 (emphasis added), and criticizing the bankruptcy court for relying on "back-of-the-envelope forecasts of hypothetical worst-case scenarios," *id*. at 49, that may or may not ultimately come to pass.  Viewed from the proper petition-date vantage point, it was clear that "LTL did not have any likely need in the present or the near-term, or even in the long-term, to exhaust its funding rights" from J&J.  *Id*. at 50.  The *LTL* opinion further highlights that a projection cannot assume each claim "would go to and succeed at trial," but instead must consider "the possibility of meaningful settlement, as well as successful defense and dismissal, of claims."  *Id.* at 49.

liabilities as they [come] due for the foreseeable future," including by virtue of the "funding backstop" provided by their parent company. *LTL* [Ex. A] at 51. *See also id.* (quoting the very same funding agreement recital that was copied into the Funding Agreement here, *see supra* n.3, *i.e.*, that LTL had "assets having a value at least equal to its liabilities" and the "financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business").

6.     On these facts – which are substantially similar to *LTL*, including an even more payee-friendly Funding Agreement – the Debtors did not enter bankruptcy on account of any financial distress and thus their cases are subject to dismissal.[10]  The *LTL* court rested its decision solely on this fact, and went no further.  Ex. A at 53–54 ("Because LTL was not in financial distress, it cannot show its petition served a valid bankruptcy purpose and was filed in good faith under Code § 1112(b).").  A separate and independent ground for dismissal was alluded to but ultimately not resolved:

> Because we conclude LTL's petition has no valid bankruptcy purpose, we need not ask whether it was filed "merely to obtain a tactical litigation advantage."  [*In re 15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009).]  Yet it is clear LTL's bankruptcy filing aimed to beat back talc litigation in trial courts….  While we ultimately leave the question unaddressed, a filing to change the forum of litigation where there is no financial distress raises, as it did in [*In re SGL Carbon Corp.*, 200 F.3d 154,

---

[10]   The Third Circuit's *LTL* decision is in harmony with the standards employed in the Seventh Circuit. Here, as in the Third Circuit, financial distress is a critical and independent component of the good faith test.  *E.g.*, *In re Scheffler*, 86 B.R. 576, 579 (Bankr. W. D. Wis. 1986) ("In order for there to be a good faith bankruptcy filing there must be real debts, real creditors, and the debtor must need relief from financial distress."); *see also, e.g.*, *In re Liptak*, 304 B.R. 820, 830 (Bankr. N.D. Ill. 2004) ("The test is whether the debtor has a business justification for thwarting a judgment creditor's collection activity and forcing them to accept other (possibly reduced) future payment rights under a reorganization plan in lieu of assets crucial to operating the business. This justification does not exist if the debtor could have satisfied a judgment with funds and savings that were not being used to operate a business."); *see also In re N.R. Guaranteed Ret., Inc.*, 112 B.R. 263, 273 (Bankr. N.D. Ill. 1990), *aff'd*, 119 B.R. 149 (N.D. Ill. 1990) (recognizing that while no particular type of financial distress is required for a filing, "if the debtor's business could continue unimpaired, without a bankruptcy filing, a creditor whose rights are impacted by the filing has 'cause' for relief, independent of the other factors listed in the decisions on good faith in filing").

169 (3d Cir. 1999)], the specter of "abuse which must be guarded against to protect the integrity of the bankruptcy system."  [Ex. A at 54 n.19.]

7.     Even more egregious tactical forum shopping is present here.  The record leaves no room for doubt that the Debtors, who seemingly answer only to 3M, filed a petition for relief to use "the tools of bankruptcy" to try to force an unfavorable outcome on CAEv2 claimants to the benefit of 3M, under the guise of "efficiency" and purported equitable treatment.  Seventh Circuit law has recognized such conduct as a basis for dismissal of bankruptcy cases for upwards of 80 years. *See In re Cook*, 104 F.2d 981, 985 (7th Cir. 1939) (dismissing petition filed "to escape the jurisdiction of another court where the day of reckoning … was at hand").  And absent the consent of a super-majority of CAEv2 claimants, there would simply be no possible path to reorganization, which would further warrant dismissal.  To the extent the Court deems it necessary to go beyond the dispositive analysis in *LTL*, dismissal of these cases as an improper litigation tactic is also amply warranted.

*      *      *

8.     At one point during the trial on the Debtors' preliminary injunction motion, the Court remarked that it "would be really nifty if LTL's appeal were actually decided."  Aug. 15 Hr'g Tr. 45:21-22.  The *LTL* decision ultimately came roughly five months after this Court denied the Debtors' request for injunctive relief, but the Third Circuit's analysis in *LTL* dovetails perfectly with the facts adduced at trial and the findings this Court made in the PI Order, including but not limited to the Funding Agreement.  The same facts and analysis are also dispositive as to the Debtors' entitlement to be in bankruptcy at all.

## II.  BACKGROUND

**A.    3M's CAEv2 Liability, Dissatisfaction with the MDL, and Attempt to Forum Shop**

9.      The CAEv2 tort litigation was sparked by a *qui tam* action styled *United States ex rel. Moldex-Metric, Inc. v. 3M Company*, Case No. 16-1533 (D.S.C. May 12, 2016), which alleged that 3M defrauded the United States military by knowingly concealing defects in the earplugs it manufactured and sold to the government.  3M settled the *qui tam* action with the United States for over $9 million paid only by 3M.  Private personal-injury litigation followed.  One of the first suits, filed in December 2018, named 3M and "Doe" defendants (not Aearo), and alleged that 3M's defective CAEv2 earplugs caused hearing loss and tinnitus.  Ex. 71.  Hundreds of veterans with similar injuries sued soon after.  Facing suits nationwide, 3M supported centralization through the MDL process and on April 3, 2019, the United States Judicial Panel on Multidistrict Litigation consolidated the actions before the MDL court.  MDL D.I. 1.  Similar lawsuits have been consolidated in Minnesota.  PI Order at 5.

10.      For the next three and a half years, 3M – and only 3M – vigorously litigated the MDL:  "negotiating for governing procedural and logistical rules; engaging in common corporate, military, and expert discovery, as well as case-specific discovery for 19 bellwether plaintiffs; completing case-specific discovery and dispositive motions practice for 374 Wave 1 cases; and extensively briefing (and orally arguing, as appropriate) issues ranging from the applicability of the federal officer removal statute (as to certain claims) and the federal government contractor defense (as to all design defect and failure to warn claims) to more than 260 motions in limine, 109 *Daubert* challenges, 42 case-specific summary judgment motions, 47 choice of law disputes, and 21 post-trial motions," among other issues.  MDL D.I. 3610.  3M used the MDL process to its advantage, but ultimately faced a number of litigation setbacks that left it dissatisfied.

11.     In July 2020, the MDL court ruled against 3M on the government contractor defense.  MDL D.I. 1280.  That ruling is currently on appeal before the Eleventh Circuit and the appeal is proceeding with relief from stay.  Bankr. D.I. 548.  The MDL court also adopted a bellwether process that resulted in 16 trials,[11] encompassing 19 plaintiffs before nine different trial judges.  Adv. D.I. 122 ¶¶ 36–37, 125.  The verdicts, the first of which was reached in April 2021, have been decidedly in plaintiffs' favor, with 13 plaintiff verdicts and six defense verdicts.  *Id.*  By March 2022, the majority of the bellwether trials in the MDL had concluded, and the MDL court had commenced issuing "wave orders" returning 1,500 cases (Waves 1 through 3) to the district courts in which they were originally filed.  Aug. 16 Hr'g Tr. 181:19–24.

12.     Faced with these litigation setbacks, in March 2022, 3M General Counsel Kevin Rhodes assembled a team of 3M executives to work on "Project Crane," to explore "strategic alternatives to managing 3M's litigation."  Aug. 16 Hr'g Tr. 179:15–181:17, 185:4–11; Ex. GF (July 23, 2022 Board minutes at 7).  Minutes from a 3M board meeting reveal that Project Crane served as 3M's "liability risk management" strategy with respect to the CAEv2 litigation.  Ex. GF (May 9–10, 2022 3M Board minutes at 6–7).

13.     On July 22, 2022, 3M's Board received "an update on MDL court-order mediation and settlement discussions."  Ex. GF (July 22, 2022 3M Board minutes at 2); Aug. 16 Hr'g Tr. 184:3–17.  The next day, on July 23, 2022, 3M's Board received a presentation on "potential subsidiary chapter 11 proceedings," a "potential funding and indemnification agreement," and the sufficiency of "$1 billion in trust funding."  Ex. GF (July 23, 2022 3M Board minutes at 8); Aug.16 Hr'g Tr. 185:12–16.  At the meeting, 3M's board resolved to empower an authorized 3M signatory

---

[11]    3M selected nine cases, plaintiffs selected nine cases, and the MDL court selected seven cases.  Adv. D.I. 122 ¶ 30.

to execute the Funding Agreement.  Ex. GF (July 23 3M Board minutes at 14–16); Aug. 16 Hr'g Tr. 184:18–185:23.  The 3M board resolution indicates that, by July 23, 2022, the 3M board had determined that the MDL had "not provided a pathway to" resolving the CAEv2 litigation and had "determined that [3M] should instead seek to resolve the claims [including those asserted against 3M] *through* a chapter 11 process of the Aearo Entities."  Ex. GF (July 23 3M Board minutes at 15 (emphasis added)).  The Funding Agreement was drafted initially by Kirkland & Ellis at the request of 3M (not the Debtors) as part of Project Crane's objective of furthering 3M's "liability risk management" of CAEv2 litigation.  Exs. AG, GF.

14.     The Debtors and 3M entered into the Funding Agreement on July 25, 2022, one day before the petition date.  Ex. 2.  Mr. Dai signed for 3M and Mr. Stein signed for the Debtors. Ex. 2.[12]  The Funding Agreement provides uncapped funding, whether in bankruptcy or outside of bankruptcy, to pay all of the Debtors' liabilities (including, without limitation, liabilities for CAEv2 claims)[13] whenever the Debtors' assets or income are ***or are projected to be*** insufficient, in exchange for the Debtors assuming the obligation to indemnify 3M for payments made under the Funding Agreement.  Ex. 2 at 6–7, 9–10 (definition of "Permitted Funding" and §2).  The Funding Agreement's definition of "Commitment" expressly states "the Commitment does not serve as a cap on [3M's] funding obligations or otherwise limit [3M's] Payments under the terms of this Agreement."  Ex. 2 at 4.  3M also fully funds any indemnification obligations that the Debtors may owe to 3M under the Funding Agreement.  Ex. 2 at 7 (Permitted Funding Use at (c)).

---

[12]   Mr. Stein and Roger Meltzer, the other independent director on the board of the Debtors, determined that the Funding Agreement raised a "conflict" with 3M and, as a result, only they had the corporate authority to bind the Debtors to the Funding Agreement.  Aug. 16 Tr. at 215:5–20.

[13]   The Funding Agreement further provides that 3M will fully fund administrative expenses in the bankruptcy cases and any professional fees the Debtors may incur ancillary to the CAEv2 earplug liabilities.  Ex. 2 at 6 (Permitted Funding Use at (a) & (b)(iv)).

Stated differently, if 3M asserts an indemnity claim against the Debtors, the Debtors are entitled to have 3M pay the Debtors in order to satisfy the indemnity owed to 3M.  PI Order at 9–11.

15.     The stated purpose of these cases was to "permanently protect the Debtors and 3M from further [CAEv2] claims," First Day Decl. ¶ 51, and to find an alternative liability resolution strategy to the CAEv2 litigation.  *See* PI Order at 7 (the Debtors pursued bankruptcy as a "strategic alternative[] to the MDL").  In the Debtors' first day filings and at their first day hearing, the Debtors excoriated the MDL court as "out-of-control" and "broken."  The Debtors' counsel stated on the record: "I don't think that there's a single MDL in history that is as broken as this one is. … I am blaming the district judge, … the heart of our problem comes out of her court."  July 27 Hr'g Tr. 38:23–24, 39:20–23, 42:20–43:2.  Counsel then explained the timing of the bankruptcy filing:  "Judge Rodgers … is about to remand thousands of cases back ….  So the out-of-control docket now becomes an out-of-control remand docket."  July 27 Hr'g Tr. 43:3–9.  The Debtors' informational brief criticized the MDL court for a "frenetic bellwether cadence," "gutted defenses," and "tainted ... trials," decrying the MDL as "a recent and extreme example of the systemic shortcomings of traditional litigation."  Info. Br. 43 & 52.  The Debtors' first day declaration likewise disparaged the MDL as "unmanageable."  First Day Decl. ¶ 38.

16.     Soon thereafter, the MDL court observed "it seems to me that the funding and the indemnity agreement were structured for the sole purpose of resolving 3M's liability in bankruptcy as opposed to under this Court's jurisdiction rather than to validly reorganize Aearo."  MDL Aug. 11 Hr'g Tr. 27:12–17.  More recently, the MDL court sanctioned 3M for its "[c]ontumacious conduct and bad faith tactics" in "devis[ing] a scheme to oust the Congressionally-established system for resolving mass tort disputes in Article III courts and install its new favored forum (for the moment, anyway), an Article I court, at the helm."  MDL D.I. 3610 at 1 & 7.  After recounting

how 3M supported centralization in the MDL and voluntarily participated in those proceedings for years, the MDL court concluded on the ample record before it that 3M put the Debtors into bankruptcy "[n]ot because any of the entities was facing a *bona fide* threat of financial distress, and not due to managerial or operational difficulties that were jeopardizing the entities' continued viability," but rather because of "good old-fashioned forum shopping, solely – and admittedly – designed to evade dissatisfactory legal rulings and verdicts in the MDL, and to avoid potential future liability of a *non-debtor*, 3M, in the tort system." *Id.* at 7–8.  The MDL court went on:

> 3M itself was not willing to pay the price of admission to an Article I forum – here, reorganization and submission to the oversight of the bankruptcy court.  Not to be denied, the company hatched a workaround.  Aearo would file for Chapter 11 bankruptcy protection but seek an extension of the statutory automatic stay of litigation to 3M, who would never file a bankruptcy petition itself.…  Aearo would be recast as the "real-party defendant" when it comes to CAEv2 claims.…  If successful, 3M would reap all the benefits of bankruptcy with none of the attendant burdens.

*Id.* at 8–9.  In the face of this "brazen abuse of the litigation process" and "bad faith," the MDL court sanctioned 3M by precluding it "from attempting to avoid any portion of its alleged liability for the CAEv2 claims in this litigation by shifting blame to the Aearo defendants, as a sanction for the company's explicit statements and conduct establishing itself as the sole responsible party for nearly four years in the MDL and its bad faith reversal of that position solely to serve its strategic objectives in bankruptcy."[14]  *Id.* at 10, 17 & 21.

---

[14]  This litigation posture now accords with the facts: 3M manufactured, marketed, sold, and distributed the CAEv2 earplugs; 3M fraudulently concealed the product's defects from the U.S. military and the servicemembers who relied on the earplug to keep them safe; 3M silently pulled the product from the market without disclosing its defects; and 3M paid millions to settle the *qui tam* allegations of its fraudulent conduct.  In short, 3M is the "real party defendant" here who is responsible for the harms alleged in the CAEv2 litigation.

**B.**     **The Debtors Are Operationally Sound and Have No Need to Reorganize**

17.     The Debtors operate an approximately $100 million business "sitting inside of a $35 billion conglomerate." Aug. 15 Hr'g Tr. 58:14–13. In addition to their own products, the Debtors produce products (but not any CAEv2 earplugs) for 3M, resulting in an additional $25 million a year in revenue. Aug. 15 Hr'g Tr. 61:11–14. The Debtors generate approximately $15 million to $20 million in cash flow. 3M acquired the Debtors in 2008 and "upstreamed" its Head, Eye, Ear, Hearing, and Face Safety business, which includes the manufacturing, marketing, and selling of CAEv2 earplugs, to 3M in 2010. PI Order at 4. That upstream generated a receivable on the Debtors' books of approximately $965 million that, as of the petition date, remained unpaid by 3M and was available to pay the totality of all adverse verdicts, plus legal fees, in the CAEv2 litigation at that time, even if the Debtors had been called upon to pay such amounts (which they had not). *Id.*

18.     As of the petition date, the ongoing CAEv2 litigation had no impact on the Debtors' business. Chief Restructuring Officer John Castellano testified that the Debtors are operationally healthy and that but for tort liabilities, the Debtors "wouldn't have any reason to seek bankruptcy protection." Aug. 15 Hr'g Tr. 154:19–155:11. No employee of the Debtors or of the Debtors' non-debtor subsidiaries testified at any trial or deposition in the CAEv2 litigation or had to collect or review documents in connection with the litigation. Aug. 15 Hr'g Tr. 165:16–166:25. This Court found no evidence of workforce distraction or managerial difficulties, PI Order at 34–35, and 3M continues to provide services to the Debtors under the Shared Services Agreement. Aug. 15 Hr'g Tr. 162:16–23. No exigent circumstances led to the filing of these cases or the preliminary injunction motion. Aug. 17 Hr'g Tr. 62:1–4. Indeed, excluding the costs of administering these cases, the Debtors have remained profitable during the pendency of the bankruptcy. *See, e.g.*, Bankr. D.I. 948 & 1025 (November & December MORs).

13

19.     By virtue of the Funding Agreement, the Debtors ultimately face no risk from the CAEv2 litigation.  The Funding Agreement requires 3M to fund a request for payment of CAEv2 liabilities if the Debtors' assets are "***or are projected to be*** … insufficient to pay or satisfy such Liabilities or amounts in full and otherwise maintain the Minimum Balance," which is defined as $5 million cash on hand held, in the aggregate, by the Debtors.  Ex. 2 at 7 & 8 (emphasis added).  As the testimony at the preliminary injunction hearing confirmed, and as the Court found in the PI Order, this provision converts the definition of "Permitted Funding Use" from an actual requirement that the Debtors liquidate themselves into a mathematical exercise: the Debtors' assets can safely be "projected to be" less than any measure of 3M's multi-billion-dollar CAEv2 liabilities – and that fact can be readily ascertained without interrupting the Debtors' cash flow or liquidating the Debtors' assets.  Aug. 16 Hr'g Tr. 275:19–23.

20.     In short, the funds necessary to operate the Debtors' financially healthy operations (which no longer have anything to do with earplugs) are in no way put at risk by the claims asserted in the CAEv2 litigation.  Rather, 3M is contractually obligated and financially able to furnish the funds necessary to pay creditor claims in these cases.  The Funding Agreement is thus accurate in its recitation that "each of the [Debtors] will have assets with a value greater than its Liabilities and will have financial capacity to satisfy its obligations as they become due in the ordinary course of its business, including with respect to any [CAEv2 liabilities]."  Ex. 2 at 2.

21.     The financial strength of the Debtors' parent company, 3M, is likewise undisputed.  3M is a Fortune 500 company and the maker of some of the most ubiquitous and well-known products in the world, including Scotch® tape and Post-it® notes.  Ex. GL at 5.  As this Court found, "[t]he evidence that Aearo … presented in support of the PI Motion emphasizes that 3M is more than able to honor the Funding Agreement, even if the [CAEv2 litigation] proceed[s]."  PI

Order at 34; *see also id.* at 34 n.16 (noting that the Debtors "provid[ed] evidence to establish that 3M has more than enough financial wherewithal to honor the Funding Agreement"). That evidence included, among other things, the testimony of the Debtors' independent director that negotiations over the Funding Agreement considered 3M's financial wherewithal and viability, and that the independent directors concluded, after thorough investigation, that 3M was a viable funding source. Aug. 16 Tr. 229:20–231:11, 238:7–22; Ex. 142 (July 14, 2022 Board minutes with presentation on "the strong financial position of 3M" after Healthcare Group spinoff).

22.     3M touts a "strong" "liquidity profile" and "credit profile" in its securities filings. According to SEC filings as of year-end 2021, 3M has an A1 credit rating from Moody's and an A+ from Standard & Poor's, net sales of over $35 billion, and free cash flow of over $5.8 billion. Ex. GL at 13, 39, 45. Over the past three years 3M has distributed more than $13 billion to its shareholders in the form of dividends and share buybacks. And on the same day 3M caused the commencement of these bankruptcy cases, 3M announced a planned spinoff of its healthcare business. By way of comparison, the $347 million that 3M had expended on litigation defense costs, even when coupled with the amount of total adverse verdicts (less than $300 million excluding interest), which 3M was actively appealing or from which it was seeking post-trial relief, is merely a fraction of what 3M expends annually on dividend payments and share buy-backs. Aug. 16, 2022 Hr'g Tr. 186:17–187:1 (total of all fees and expenses incurred in defense of CAEv2 amounts to $347 million); MDL D.I. 3610 at 7 (noting jury verdicts "totaling nearly $300,000,000"); Form 8-K, 3M Company (January 24, 2023) at 4 (stating that "3M returned $4.8 billion to shareholders via dividends and gross share repurchases" in the last year).

23.     Finally, when the CAE Committee sought discovery with respect to 3M's ability to honor its commitments under the Funding Agreement, both 3M and the Debtors refused to produce

responsive materials.  They asserted that 3M's financial capacity "is neither relevant nor necessary

given [CAEv2 claimants'] position at the hearing on the Debtors' Preliminary Injunction Motion

and the particular issues in these cases."  3M's Responses to the CAE Committee's December 13,

2022 Priority Requests, at ¶ 3; Debtors' Responses to the CAE Committee's December 13, 2022

Priority Requests, at ¶ 3.  Thus, by both the Debtors' and 3M's own telling, 3M's financial

wherewithal is undisputed.

### III.  GOOD FAITH STANDARD

24.     Bankruptcy cases are subject to dismissal for "cause," subject to limited exceptions

not relevant here:

> Except as provided in paragraph (2) and subsection (c), on request of a party
> in interest, and after notice and a hearing, the court shall convert a case
> under this chapter to a case under chapter 7 or dismiss a case under this
> chapter, whichever is in the best interests of creditors and the estate, for
> cause unless the court determines that the appointment under section
> 1104(a) of a trustee or an examiner is in the best interests of creditors and
> the estate.

11 U.S.C. § 1112(b)(1).  That is true regardless of whether a debtor has filed a plan or has reached

the end of its exclusivity period.  *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994) ("A

Chapter 11 case can be dismissed at any time.").

25.     The Bankruptcy Code enumerates certain specific examples of cause, but these

statutory examples are not exclusive, and courts uniformly hold that the absence of good faith is

cause for dismissal.  *See, e.g.*, *In re Madison Hotel Assocs.*, 749 F.2d 410, 426 (7th Cir. 1984) ("It

is generally recognized that 'good faith' is a threshold prerequisite to securing Chapter 11 relief,

and that the lack of such good faith constitutes 'cause,' sufficient for dismissal under 11 U.S.C.

§ 1112(b)."); *In re Castleton Assocs. Ltd. P'Ship*, 109 B.R. 347, 349–50 (Bankr. S.D. Ind. 1989)

(same).  A lack of good faith does not require a finding of subjective bad faith, malfeasance, or

intentional abuse.  *See, e.g.*, *In re Grieshop*, 63 B.R. 657, 663 (N.D. Ind. 1986) (dismissal even

where debtor was not "motivated by ill will").  Rather, good faith centers on whether the case was filed to achieve "a legitimate reorganization objective within the scope of the Bankruptcy Code," rather than for "tactical reasons unrelated to reorganization."  *In re Liptak*, 304 B.R. at 828.  *See also supra* n.7 (quoting the Ninth Circuit's decision in *In re Marsch*, 36 F.3d 825, to the same effect).

26.     *LTL* is the most recent reaffirmation and most directly applicable exposition of the good faith inquiry.  In it, the Third Circuit characterized the test as consisting of two distinct questions:

- Whether the petition serves a valid bankruptcy purpose, which requires that the debtor is in some degree of "financial distress"; and

- Whether the bankruptcy was "filed merely to obtain a tactical litigation advantage."

Ex. A at 34 (citing, *inter alia*, *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 128 (3d Cir. 2004)).  *LTL* makes clear that the debtors themselves (not any non-debtors) are the proper focus, *see id*. at 43–45, and the relevant timeframe is the date the petition was filed, *see id*. at 46–54.  *See also supra* nn. 8–9 (discussing these aspects of *LTL* in greater detail).

27.     The Third Circuit's case law is well-developed on the topic of good faith and is fully consistent with Seventh Circuit law.  *See generally In re N.R. Guaranteed Ret.*, 112 B.R. at 272 (explaining the development of case law in this area).[15]  Courts in the Seventh Circuit agree that financial distress is a critical element of a good faith filing and an independent ground for

---

[15]   Although some lower courts in the Seventh Circuit have set out multi-factor tests with respect to good faith, these exercises are "neither exhaustive nor mandatory," *In re Lake Michigan Beach Pottawattamie Resort LLC*, 547 B.R. 899, 905 (Bankr. N.D. Ill. 2016), and in general are of little use. *See, e.g.*, *Marrs v. Motorola, Inc.*, 577 F.3d 783, 788 (7th Cir. 2009) ("Multifactor tests with no weight assigned to any factor are bad enough from the standpoint of providing an objective basis for a judicial decision; multifactor tests when none of the factors is concrete are worse.").

dismissal,[16] and that a bankruptcy case filed merely to gain a tactical litigation advantage is subject to dismissal.[17] Indeed, with respect to the latter point, the Seventh Circuit's decision in *In re Cook* is particularly pointed in holding that a bankruptcy filing cannot properly be used to "escape the jurisdiction of another court." 104 F.2d at 985. All of this is consistent with case law from other Circuits.[18]

---

[16] *See id*. at 272-73; *In re Tekena USA, LLC*, 419 B.R. 341, 349 (Bankr. N.D. Ill. 2009); *In re Liptak*, 304 B.R. at 830; *In re MGN Co., III*, 116 B.R. 654, 658 (Bankr. S.D. Ind. 1989); *In re Scheffler*, 86 B.R. at 579; *In re Collins*, 250 B.R. 645, 657-58 (Bankr. N.D. Ill. 2000).

[17] *In re Liptak*, 304 B.R. at 830, 835 (dismissal is proper where a bankruptcy is "merely being used as a tactic to delay pursuit of [creditors'] rights," including to frustrate collection of a judgment, collaterally attack a judgment, or "shop for a more favorable forum"); *In re Cap. Equity Land Tr. No. 2140215*, 646 B.R. 463, 477 (Bankr. N.D. Ill. 2022) (dismissing case "filed in response to the state court tax sale proceeding" as a "litigation tactic"); *In re Posner*, 610 B.R. 586 (Bankr. N.D. Ill. 2019) ("Filing bankruptcy to circumvent pending litigation is an indication of bad faith.").

[18] *See, e.g.*, *In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 280-81 (4th Cir. 2007) (affirming dismissal of chapter 11 petition as a bad faith filing where the debtor was not "experiencing financial difficulties" and filed to gain a litigation advantage over an adversary); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 377-81 (8th Cir. 2000) (affirming bad faith dismissal of chapter 11 petition where debtor had already solved its financial problems and filed for the sole purpose of disposing of shareholders' lawsuit); *In re Marsch*, 36 F.3d at 828-29 (dismissal of chapter 11 petition for cause was proper where the debtor had the financial means to pay its debts and petition was filed as a litigation tactic); *Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983) ("The Bankruptcy provisions are intended to benefit those in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation."); *In re HBA East, Inc.*, 87 B.R. 248, 259–60 (Bankr. E.D.N.Y. 1988) ("As a general rule where, as here, the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith."); *In re Moog*, 159 B.R. 357, 361 (Bankr. S.D. Fla. 1993) (explaining that "if the timing of the filing [of the petition] is such that the court concludes that the primary, if not sole purpose, of the filing was litigation tactic, the petition may be dismissed and that "frustrating the legitimate processes of a non-bankruptcy forum" is inconsistent with congressional intent of the Bankruptcy Code); *In re Karum Grp., Inc.*, 66 B.R. 436 (Bankr. W.D. Wash. 1986) (case dismissed where debtor filed as a litigation tactic to avoid posting supersedeas bond); *In re Golden Ocala P'ship*, 50 B.R. 552 (Bankr. M.D. Fla. 1985) (chapter 11 not designed to resolve internal fights between feuding shareholders); *In re Ofty Corp.*, 44 B.R. 479 (Bankr. D. Del. 1984) (bankruptcy case filed to circumvent liquidation orders in state court dismissed as a bad faith filing); *In re Wally Findlay Galleries (N.Y.) Inc.*, 36 B.R. 849 (Bankr. S.D.N.Y. 1984) (bankruptcy case dismissed where intent was to relitigate rather than to reorganize).

## IV.  ARGUMENT

### A.   The Debtors Were Not, Are Not, and Cannot Be In Financial Distress

28.    A "valid bankruptcy purpose" includes preserving a going concern or maximizing the value of a debtor's estate, and, importantly, it "assumes a debtor in financial distress." *LTL* [Ex. A] at 34.  Case law in the Seventh Circuit and around the country is clear that the "most basic" ground "for dismissal of a Chapter 11 case is that the filing is unnecessary." *In re N.R. Guaranteed Retirement*, 112 B.R. at 272.   The presence of this element is outcome determinative and establishes cause for dismissal "independent" of whether the movant can establish the other factors discussed in the case law.  *Id*. at 273.

29.    For example, the debtor in *LTL* faced "massive" tort liabilities and was party to a pre-bankruptcy agreement pursuant to which the costs of the debtor's bankruptcy case and payment of creditors' claims were backstopped by a funding commitment from a non-debtor affiliate.  *LTL* [Ex. A] at 45–54.  Because the debtor had "a funding backstop, not unlike an ATM disguised as a contract, that it can draw on to pay liabilities without any disruption to its business or threat to its financial viability," the court concluded that the debtor "was not in financial distress" and thus its bankruptcy case was subject to dismissal.  *Id.* at 52–54.  The court observed that J&J's "triple A-rated payment obligation for LTL's liabilities … weakened LTL's case to be in bankruptcy," because "the bigger a backstop a parent company provides a subsidiary, the less fit that subsidiary is to file."  *Id.* at 55.

30.    Just as in *LTL*, the Debtors in these cases were, at the time of the bankruptcy filing, "highly solvent with access to cash to meet comfortably [their] liabilities as they [come] due for the foreseeable future," including by virtue of the "funding backstop" provided by their highly profitable non-debtor parent, 3M.  *LTL* [Ex. A] 51.  These cases do not involve a trade-off between maximizing the value of assets necessary to support the Debtors' operations versus funding

creditors' claims.  Rather, by virtue of 3M's uncapped, non-recourse commitment under the Funding Agreement, 3M is contractually obligated (and financially able) to backstop payment of allowed creditor claims in full without any risk to the operation of the Debtors' financially healthy businesses, whether the Debtors are in bankruptcy or not.  In other words, "the debtor's business could continue unimpaired, without a bankruptcy filing," *In re Local Union 722*, 414 B.R. at 450, and these bankruptcy cases are "merely being used as a tactic to delay" the pursuit of "creditors' nonbankruptcy collection rights … without any offsetting benefits to the creditor body." *In re Liptak*, 304 B.R. at 830; *cf.* Aug. 17 Hr'g Tr. 58:8–59:25 (Mr. Stein's testimony that subsection (b)(i) of the definition of "Permitted Funding Use" in the Funding Agreement "provides significant flexibility in relation to considering alternate paths to resolve the claims," which is only available outside of bankruptcy).

31.     Moreover, the mass tort litigation the Debtors faced as of the Petition Date, even while voluminous and mounting, had not caused the kind of immediate financial distress to the Debtors (or even to 3M for that matter) for which the invocation of bankruptcy protection is made in good faith.  In *LTL*, the Third Circuit observed that "[f]inancial distress must not only be apparent, but it must be immediate enough to justify a filing." *LTL* [Ex. A] at 39.  "[A]n attenuated possibility standing alone that a debtor may have to file for bankruptcy in the future does not establish good faith." *Id.*  The court explained:

> Risks associated with premature filing may be particularly relevant in the context of a mass tort bankruptcy.  Inevitably those cases will involve a bankruptcy court estimating claims on a great scale – introducing the possibility of undervaluing future claims (and underfunding assets left to satisfy them) and the difficulty of fairly compensating claimants with wide-ranging degrees of exposure and injury.  On the other hand, a longer history of litigation outside of bankruptcy may provide a court with better guideposts when tackling these issues.  [*Id.* at 40.]

32.     These risks at the are forefront here.  While the Debtors invoke bankruptcy to (under)estimate the totality of all CAEv2 claims, as of the petition date, the Debtors had not paid a single penny in CAEv2 litigation expense or liability; the 16 adverse bellwether verdicts had all been appealed (and were bonded by 3M alone); even if the verdicts are affirmed and (in a change of *status quo*) collected from the Debtors, the Debtors had a near $1 billion receivable from 3M sufficient to pay them in full; and the Debtors were under zero operational and financial pressure as a result of the litigation.  In short, just like *LTL*, the Debtors' bankruptcy filing was made without any immediate financial distress, thereby raising all of the concerns of a premature filing against which the Third Circuit cautioned in *LTL*.

33.     No amount of subjective good faith can save a petition filed by an entity not in financial distress.  Thus, any professed belief by the Debtors or 3M that bankruptcy is a more efficient forum to resolve CAEv2 claims, even if sincere, "is not enough" and "cannot displace the rule that resort to Chapter 11 is appropriate only for entities facing financial distress."  *LTL* [Ex. A] at 56.  "This safeguard ensures that claimants' pre-bankruptcy remedies – here, the chance to prove to a jury of their peers injuries claimed by a [defective] product – are disrupted only when necessary."  *Id.*  What matters is the objective fact that the contingent tort liabilities in question are fully backstopped by 3M's uncapped, nonrecourse funding commitment.  Those liabilities cannot serve to justify the filing of these cases by admittedly financially healthy entities.

34.     It is difficult to imagine a more directly on-point decision than *LTL*.  Indeed, in virtually every instance the names "LTL" and "J&J" could simply be replaced with "Aearo" and "3M" and the analysis would line up perfectly.  To the extent there are differences, they either militate more strongly in favor of dismissal (*e.g.*, J&J's funding obligation in *LTL* was capped at $61.5 billion, whereas 3M's funding obligation here is uncapped), or they are irrelevant (*e.g.*, the

fact that the Debtors operate a business – albeit one that has nothing to do with earplugs, whereas the debtor in *LTL* at most was the owner of a passive royalty stream). The material facts are the same, and thus the result – dismissal – should be the same as well.

**B.    The Bankruptcy Was Filed To Secure A Tactical Litigation Advantage**

35.    Bankruptcy cases are also subject to dismissal when they are used as mere litigation tactics. Courts ask whether a putative reorganization is merely "a mechanism to orchestrate pending litigation," *In re Integrated Telecom*, 384 F.3d at 120, an effort "to distribute value directly from a creditor to a company's shareholders," *id*. at 129, or "primarily [about] protecting" non-debtors, such as a corporate parent, "from liability in pending litigations," *BEPCO*, 589 F.3d at 608 & 624 – none of which are valid reorganizational aims. Regardless of the particular language used, the fundamental principle is that a debtor cannot use bankruptcy for "tactical reasons unrelated to reorganization," *In re Tekena USA* 419 B.R. at 349, including (as particularly relevant here) to "pressure [litigation] plaintiffs to accept the company's settlement terms," *SGL Carbon*, 200 F.3d at 167, or "to escape the jurisdiction of another court where the day of reckoning for … acts of misconduct was at hand," *In re Cook*, 104 F.2d at 985.

36.    Lack of financial distress is often closely related to the use of bankruptcy as a mere litigation tactic. As one court from within this Circuit has explained:

> A truly unnecessary Chapter 11 case imposes improper burdens both on creditors and on the bankruptcy system. The creditors are arbitrarily required to accept rights in bankruptcy in place of their … rights under non-bankruptcy law (at the very least, the automatic stay is imposed upon them), and the bankruptcy system is required to waste its resources, possibly interfering with the processes of other court systems.

*In re N.R. Guaranteed Ret.*, 112 B.R. at 272. The factors are related because "the more that the bankruptcy case appears to be a forum-shopping attempt" for non-bankruptcy litigation, the less the debtor has a legitimate "need for the type of bankruptcy relief contemplated by the Bankruptcy

Code." *In re Liptak*, 304 B.R. at 832. As such, bankruptcy cases that are filed to "collaterally attack" the judgments of other courts and "shop for a more favorable forum" should be dismissed because they are aimed at obtaining a tactical advantage in non-bankruptcy litigation, as opposed to pursuing a legitimate need to reorganize. *Id.* at 835; *see also id.* at 833 ("A desire to avoid paying a disputed debt that [a debtor] is capable of satisfying," without imperiling the debtor's business operations is not sufficient to demonstrate a legitimate need for bankruptcy.).

37.     The record here – including the Debtors' own statements and filings – compels the conclusion that 3M instigated these bankruptcy cases to change forums and escape adverse rulings by the MDL court, as well as to trigger a stay of non-bankruptcy litigation against non-debtor 3M (a request made concurrently with the filing of the petitions, but ultimately denied by the PI Order) and disadvantage CAEv2 claimants in that litigation.[19] *Cf. In re Cook*, 104 F.2d at 985; *In re Liptak*, 304 B.R. at 835; *In re N.R. Guaranteed Retirement*, 112 B.R. at 272. The bankruptcy filing was "good old-fashioned forum shopping, solely – and admittedly – designed to evade dissatisfactory legal rulings and verdicts in the MDL," as the MDL court explained. The Funding Agreement was structured to resolve non-debtor 3M's liability in bankruptcy as opposed to under the MDL court's jurisdiction; it has no other purpose. *See also* PI Order at 7 (the Debtors pursued bankruptcy as a "strategic alternative[] to the MDL"); Aug. 17 Hr'g Tr. 129:12–15 (rejecting notion that the Bankruptcy Court be "the watchdog of the federal judiciary").

---

[19]   As this Court has emphasized, support of the CAEv2 claimants will be essential for confirming any plan in these cases. Nov. 10 Hr'g Tr. 17:7–11 ("[I]mportantly, such a plan … to be confirmed would need a super majority of support from creditors, meaning that most creditors would actually be agreeing to the proposed channeling injunction and release.") & 22:7–16 (admonishing that dismissal of the case for bad faith will be available should the bankruptcy become a stall tactic rather than a vehicle for resolution of claims).

38.     *SGL Carbon* is instructive.   There, the court considered whether a chapter 11 bankruptcy "filed by a financially healthy company in the face of potentially significant civil antitrust liability" should be dismissed as a bad faith filing under section 1112(b) and concluded under the above-cited standards that such a filing "lacks a valid reorganizational purpose and, therefore, lacks the requisite good faith."   200 F.3d at 156.   As here, there was "no serious evidence" that any claimed distraction from the litigation "posed a 'serious threat' to the company's operational well being," and "the company was financially healthy at the time of the filing."   *Id.* at 162–63.   Rather than filing to effectuate a legitimate reorganization, this record compelled the conclusion that the debtor filed for bankruptcy "to put pressure on [litigation] plaintiffs to accept the company's settlement terms" and "to gain tactical litigation advantages."   *Id.* at 167.   The court concluded such a filing "lacks a valid reorganizational purpose and consequently lacks good faith making it subject to dismissal 'for cause' under 11 U.S.C. § 1112(b)."   *Id.* at 169.

39.     Presciently, the *SGL Carbon* court observed that "the Bankruptcy Code presents an inviting safe harbor" for companies "that face massive potential liability and litigation costs … to rapidly conclude litigation [and] enable a continuation of their business."   *Id.*   The court cautioned that "this lure creates the possibility of abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings."   *Id.*   The Debtors' bankruptcy cases are the very type of misuse of process warned about in *SGL Carbon*.   They are aimed at obtaining a tactical advantage in non-bankruptcy litigation, as opposed to pursuing a legitimate need to reorganize.   *In re Liptak*, 304 B.R. at 835.   At bottom, 3M's mere "desire to avoid paying a disputed debt" that it is fully "capable of satisfying," *id*. at 833, is a misuse of this Court's jurisdiction, and these cases should be dismissed as such.

24

## V.  CONCLUSION

For all the reasons set forth above, these bankruptcy cases should be dismissed.

Dated:  February 3, 2023
       Indianapolis, Indiana

Respectfully submitted,

**RUBIN & LEVIN, P.C.**

*/s/ Meredith R. Theisen*

Deborah J. Caruso
Meredith R. Theisen
135 N. Pennsylvania St., Suite 1400
Indianapolis, IN 46204
Tel:    (317) 634-0300
Fax:    (317) 263-9411
Email: dcaruso@rubin-levin.net
       mtheisen@rubin-levin.net

*Indiana Counsel for the CAE Committee*

**KTBS LAW LLP**

*/s/ Michael L. Tuchin*

Michael L. Tuchin (*pro hac vice*)
Robert J. Pfister
Sasha M. Gurvitz (*pro hac vice*)
Nir Maoz (*pro hac vice*)
1801 Century Park East, 26th Floor
Los Angeles, CA 90067
Tel:    (310) 407-4000
Fax:    (310) 407-9090

**OTTERBOURG P.C.**

*/s/ Melanie L. Cyganowski*

Melanie L. Cyganowski (*pro hac vice*)
Adam C. Silverstein (*pro hac vice*)
Jennifer S. Feeney (*pro hac vice*)
Pauline McTernan (*pro hac vice*)
230 Park Avenue
New York, NY 10169
Tel:    (212) 661-9100
Fax:    (212) 682-6104

*Co-Lead Counsel for the CAE Committee*

**BROWN RUDNICK LLP**

*/s/ David J. Molton*

David J. Molton (*pro hac vice*)
Jeffrey L. Jonas (*pro hac vice*)
Seven Times Square
New York, NY 10036
Tel:    (212) 209-4800
Fax:    (212) 209-4801

*Special Litigation Counsel for the CAE Committee*

**CAPLIN & DRYSDALE, CHARTERED**

*/s/ Kevin C. Maclay*

Kevin C. Maclay (*pro hac vice*)
Todd E. Phillips (*pro hac vice*)
Kevin M. Davis (*pro hac vice*)
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
Tel:    (202) 862-5000
Fax:    (202) 429-3301

*Special Mass Tort and Negotiation Counsel for the CAE Committee*

**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC**

*/s/ Bryan F. Aylstock*

Bryan F. Aylstock (*pro hac vice*)
Brad Bradford (*pro hac vice*)
Douglass A. Kreis
Jennifer M. Hoekstra (*pro hac vice*)
17 East Main Street, Suite 200
Pensacola, FL 32502
Tel:   (850) 202-1010

*Counsel to CAE Committee Co-Lead James Beal and Certain CAEv2 Claimants*

**SEEGER WEISS LLP**

*/s/ Christopher A. Seeger*

Christopher A. Seeger (*pro hac vice*)
David R. Buchanan (*pro hac vice*)
Caleb A. Seeley(*pro hac vice*)
Maxwell H. Kelly (*pro hac vice*)
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
Tel:   (973) 639-9100
Fax:   (973) 679-8656

*Counsel to CAE Committee Co-Lead LaShaunda Parker Freeman and Certain CAEv2 Claimants*

**THE GORI LAW FIRM**

*/s/ Beth Gori*

Beth Gori
Evan Buxner
Sara M. Salger
156 N. Main St.
Edwardsville, IL 62025
Tel:   (618) 659-9833

*Counsel to CAE Committee Member Remi Beautiful Bald Eagle and Certain CAEv2 Claimants*

**LAMINACK, PIRTLE & MARTINES**

*/s/ Thomas W. Pirtle*

Thomas W. Pirtle
5020 Montrose Blvd., 9th Floor
Houston, TX 77006
Tel:   (713) 292-2750

*Counsel to CAE Committee Member Guillermo Camarillorazo and Certain CAEv2 Claimants*

**LIEFF CABRASER HEIMANN & BERNSTEIN LLP**

*/s/Elizabeth Cabraser*

Kenneth S. Byrd
Mark P. Chalos
Elizabeth Cabraser
Avery Halfon
222 Second Avenue South, Suite 1640
Nashville, TN 37201
Tel:   (615) 313-9000

*Counsel to CAE Committee Member William Darnell and Certain CAEv2 Claimants*

**PARAFINCZUK WOLF, P.A.**

*/s/ Justin Parafinczuk*

Justin Parafinczuk
Jason Wolf
Steve Resnick
Pembroke Pines Professional Centre
9050 Pines Blvd., Suite 450-02
Pembroke Pines, Florida 33024
Tel:   (215) 431-8264

*Counsel to CAE Committee Member Grayson Story and Certain CAEv2 Claimants*

**WEITZ AND LUXENBERG, PC**

*/s/ Lisa Nathanson Busch*

Lisa Nathanson Busch (*pro hac vice*)
Justine Delaney
700 Broadway
New York, NY 10003
Tel:    (212) 558-5567

*Counsel to CAE Committee Member Debra Weir and Certain CAEv2 Claimants*

**CLARK LOVE & HUTSON, GP**

*/s/ Shelley Hutson*

Shelley Hutson (*pro hac vice*)
Clayton Clark (*pro hac vice*)
Michael Moreland (*pro hac vice*)
440 Louisiana Street
Suite 1600
Houston, TX 77002
Tel:    (713) 757-1400

*Counsel to Certain CAEv2 Claimants*

**BAILEY GLASSER, LLP**

*/s/ David L. Selby, II*

David L. Selby, II (*pro hac vice*)
Katherine Charonko
209 Capitol Street
Charleston, WV 25301
Tel:    (304) 345-6555

*Counsel to Certain CAEv2 Claimants*

**LEVIN, PAPANTONIO, RAFFERTY, PROCTOR, BUCHANAN, O'BRIEN, BARR, & MOUGEY, P.A.**

*/s/ Brian Barr*

Brian Barr
W. Troy Bouk
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Tel:    (850) 435-7155

*Counsel to Certain CAEv2 Claimants*

**PAUL LLP**

*/s/ Richard M. Paul II*

Richard M. Paul II (*pro hac vice*)
Ashlea Schwarz (*pro hac vice*)
601 Walnut, Suite 300
Kansas City, Missouri 64106
Tel:    (816) 984-8100

*Counsel to CAE Committee Member Grayson Story and Certain CAEv2 Claimants*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*/s/ Adam Wolfson*

Adam Wolfson (*pro hac vice*)
Eric D. Winston (*pro hac vice*)
865 South Figueroa Street
10th Floor
Los Angeles, CA 90017
Tel:    (213) 443-3000

*Counsel to Certain CAEv2 Claimants*

**BRYANT LAW CENTER MASS TORTS DIVISION, PSC**

*/s/ David G. Bryant*

David G. Bryant
601 Washington Street
Paducah, KY 42003
Tel:    (270) 442-1422

*Counsel to Certain CAEv2 Claimants*

**GRANT & EISENHOFER, P.A.**

*/s/ Sindhu S. Daniel*

Sindhu S. Daniel
123 Justison Street
Wilmington, DE 19801
Tel:    (302) 622-7000

*Counsel to Certain CAEv2 Claimants*

**CIRESI CONLIN LLP**

*/s/ Michael A. Sacchet*

Michael A. Sacchet
225 S. 6th St., Suite 4600
Minneapolis, MN 55402
Tel:    (612) 361-8220

*Counsel to Certain CAEv2 Claimants*

**WILSON LAW, P.A.**

*/s/ Kimberly Wilson White*

Kimberly Wilson White
434 Fayetteville St., Ste. 2060
Raleigh, NC 27601
Tel:    (919) 890-0180

*Counsel to Certain CAEv2 Claimants*

**THOMAS J. HENRY LAW**

*/s/ Thomas J. Henry*

Thomas J. Henry
5711 University Heights Blvd. #101
San Antonio, TX 78249
Tel:    (210) 874-2615

*Counsel to Certain CAEv2 Claimants*

**BAILEY COWAN HECKAMAN PLLC**

*/s/ K. Camp Bailey*

K. Camp Bailey
Robert W. Cowan
Aaron M. Heckaman
Four Oaks Place
1360 Post Oak Boulevard, Suite 2300
Houston, TX 77056
Tel:    (713) 425-7100

*Counsel to Certain CAEv2 Claimants*

**BEASLEY ALLEN**

*/s/ Leigh O'Dell*

Leigh O'Dell
218 Commerce St
Montgomery, AL 36104
Tel:    (334) 269-2343

*Counsel to Certain CAEv2 Claimants*

**ROGERS, PATRICK, WESTBROOK & BRICKMAN LLC**

*/s/ Elizabeth Middleton Burke*

Elizabeth Middleton Burke
1037 Chuck Dawley Blvd., Bldg A
Mount Pleasant, SC 29464
Tel:    (843) 727-6500

*Counsel to Certain CAEv2 Claimants*

**TRACEY & FOX LAW FIRM**

*/s/ Sean Tracey*

Sean Tracey
440 Louisiana St., Suite 1901
Houston, TX 77002
Tel:    (713) 495-2333

*Counsel to Certain CAEv2 Claimants*

**THE CARLSON LAW FIRM**

*/s/ Ruth Rizkalla, Esq.*

Ruth Rizkalla, Esq.
1500 Rosecrans Avenue, Suite 500
Manhattan Beach, CA 90266
Tel:    (800) 359-5690

*Counsel to Certain CAEv2 Claimants*

**WAGSTAFF & CARTMELL, LLP**

*/s/ Thomas P. Cartmell*

Thomas P. Cartmell
4740 Grand Ave., Suite 300
Kansas City, MO 64112
Tel:    (816) 701-1100

*Counsel to Certain CAEv2 Claimants*

**SIMMONS HANLY CONROY**

*/s/ Daniel Blouin*

Daniel Blouin
John Foley
Trent Miracle
One Court Street
Alton, IL 62002
Tel:    (618) 259-2222

*Counsel to Certain CAEv2 Claimants*

**PULASKI KHERKHER, PLLC**

*/s/ Steve Faries*

Steve Faries
2925 Richmond Ave., Suite 1725
Houston, TX 77098
Tel:    (713) 664-4555

*Counsel to Certain CAEv2 Claimants*

**JUNELL & ASSOCIATES, PLLC**

*/s/ Harris Junell*

Harris Junell
Deborah K. Levy
Karen H. Beyea-Schroeder
3737 Buffalo Speedway, 18th Floor
Houston, Texas 77098
Tel:    (713) 221-3750

*Counsel to Certain CAEv2 Claimants*

**BLASINGAME, BURCH, GARRARD & ASHLEY, P.C.**

*/s/ Henry G. Garrard, III*

Henry G. Garrard, III
Sara Schramm
440 College Ave., Suite 320
P.O. Box 832
Athens, GA 30603
Tel:    (706) 354-4000

*Counsel to Certain CAEv2 Claimants*

**DOUGLAS & LONDON, PC**

*/s/ Virginia Anello*

Virginia Anello
59 Maiden Lane
6th Floor
New York, NY 10038
Tel:    (212) 566-7500

*Counsel to Certain CAEv2 Claimants*

**MONSOUR LAW FIRM**

*/s/ Douglas C. Monsour*

Douglas C. Monsour
404 N. Green St.
Longview, TX 75601
Tel:    (903) 758-5757

*Counsel to Certain CAEv2 Claimants*

**CORNELL LAW, PLLC**

*/s/ Katherine L. Cornell*

Katherine L. Cornell
5020 Montrose, 9th Floor
Houston, TX 77006
Tel:    (713) 332-2785

*Counsel to Certain CAEv2 Claimants*

**BURNETT LAW FIRM**

*/s/ Riley L. Burnett, Jr.*

Riley L. Burnett, Jr.
3737 Buffalo Speedway, 18th Floor
Houston, Texas 77089
Tel:    (832) 413-4410

*Counsel to Certain CAEv2 Claimants*

**HENINGER GARRISON DAVIS, LLC**

*/s/ Taylor Bartlett*

Taylor Bartlett
W. Lewis Garrison
2224 First Avenue North
Birmingham, AL 35213
Tel:    (205) 326-3336

*Counsel to Certain CAEv2 Claimants*

**MOSTYN LAW**

*/s/ Michael A. Burns*

Michael A. Burns
3810 West Alabama Street
Houston, TX 77027
Tel:    (713) 714-0000

*Counsel to Certain CAEv2 Claimants*

**NABERS LAW FIRM**

*/s/ Scott Nabers*

Scott Nabers
3737 Buffalo Speedway, #1850
Houston, TX77098
Tel:    (713) 422-1200

*Counsel to Certain CAEv2 Claimants*

**MORGAN & MORGAN**

*/s/ Paul J. Pennock*

Paul J. Pennock
850 3rd Avenue
Suite 402
Brooklyn, NY 11232
Tel:     (212) 738-6299

*Counsel to Certain CAEv2 Claimants*

**GIBBS LAW GROUP LLP**

*/s/ Andre M. Mura*

Andre M. Mura
Amy Zeman
505 14th St., Suite 1110
Oakland, CA 94612
Tel:     (510) 350-9717

*Counsel to Certain CAEv2 Claimants*

**ROBINSON CALCAGNIE, INC.**

*/s/ Mark P. Robinson, Jr.*

Mark P. Robinson, Jr.
19 Corporate Plaza
Newport Beach, CA  92660
Tel.:   (949) 720-1288

*Counsel to Certain CAEv2 Claimants*

**PENDLEY, BAUDIN & COFFIN, L.L.P.**

*/s/ M. Palmer Lambert*

M. Palmer Lambert
100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163-2800
Tel:     (504) 355-0086

*Counsel to Certain CAEv2 Claimants*

**GOZA & HONNOLD**

*/s/ Bradley D. Honnold*

Bradley D. Honnold
9500 Nall Ave.
Suite 400
Overland, KS 66207
Tel:     (913) 451-3433

*Counsel to Certain CAEv2 Claimants*

**WATTS GUERRA LLP**

*/s/ Mikal Watts*

Erin Rogiers
Mikal Watts
5726 W. Hausman
Suite 119
San Antonio, TX 78249
Tel:     (210) 447-0500

*Counsel to Certain CAEv2 Claimants*

**LANIER LAW FIRM**

*/s/ Rachel Lanier*

Rachel Lanier
10940 West Sam Houston Pkwy
Suite 100
Houston, TX 77064
Tel:     (800) 723-3216

*Counsel to Certain CAEv2 Claimants*

**BEGGS & LANE, RLLP**

*/s/ J. Nixon Daniel*

J. Nixon Daniel
501 Commendencia Street
Pensacola, FL 32502
Tel:     (850) 469-3306

*Counsel to Certain CAEv2 Claimants*

**STUEVE SIEGEL HANSON LLP**

*/s/ Abby E. McClellan*

Abby E. McClellan
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel:     (816) 714-7100

*Counsel to Certain CAEv2 Claimants*

**MESSNER REEVES LLP**

*/s/ Renee Finch*

Renee Finch
1550 Wewatta Street
Suite 710
Denver, CO 80202
Tel:     (303) 623-1800

*Counsel to Certain CAEv2 Claimants*

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, LLP**

/s/ Kristian Rasmussen

Kristian Rasmussen
2701 S Le Jeune Rd. 10th Floor
Coral Gables, FL 33134
Tel:    (786) 206-8306 ext. 5224

*Counsel to Certain CAEv2 Claimants*

**COLSON HICKS**

/s/ Roberto Martinez

Roberto Martinez
255 Alhambra Circle
Unit Penthouse
Coral Gables, FL 33134
Tel:    (305) 476-7400

*Counsel to Certain CAEv2 Claimants*

**ONDER LAW, LLC**

/s/ Jim Onder

Jim Onder
110 East Lockwood Avenue
St. Louis, MO 63119
Tel:    314-963-9000

*Counsel to Certain CAEv2 Claimants*

**THE KUYKENDALL GROUP, LLC**

/s/ Frederick T. Kukendall, III

Frederick T. Kukendall, III
P.O. Box 2129
Fairhope, AL 36533
Tel:    205-252-6127

*Counsel to Certain CAEv2 Claimants*

**JOHNSON BECKER, PLLC**

/s/ Timothy Becker

Timothy Becker
Stacy Hauer
444 Cedar Street
Suite 1800
St. Paul, MN 55101
Tel:    (612) 436-1800

*Counsel to Certain CAEv2 Claimants*

**CORY WATSON, PC**

/s/ Ernest Cory

Ernest Cory
2131 Magnolia Ave., S.
Birmingham, AL 35205
Tel:    (205) 328-2200

*Counsel to Certain CAEv2 Claimants*

**PITTMAN, DUTTON, HELLUMS, BRADLEY & MANN, P.C**

/s/ Christopher Hellums

Christopher Hellums
2001 Park Place North
1100 Park Place Tower
Birmingham, AL 35203
Tel:    (205) 322-8880

*Counsel to Certain CAEv2 Claimants*

**HAIR SHUNNARAH TRIAL ATTORNEYS**

/s/ Kyle C. Usner

Kyle C. Usner
3540 S. I-10 Service Rd. W, Ste 300
Metairie, LA 70001
Tel:    (504) 684-5200

*Counsel to Certain CAEv2 Claimants*

**LOCKRIDGE GRINDAL NAUEN PLLP**

/s/ Yvonne M. Flaherty

Yvonne M. Flaherty
100 Washington Ave South, #2200
Minneapolis MN 55401
Tel:    612-339-6900

*Counsel to Certain CAEv2 Claimants*

**PARKER WAICHMAN LLP**

/s/ Raymond C. Silverman

Raymond C. Silverman
Melanie H. Muhlstock
6 Harbor Park Drive
Port Washington, NY 11050
Tel:    (516) 466-6500

*Counsel to Certain CAEv2 Claimants*

**SHUNNARAH VAIL TRIAL ATTORNEYS, P.C.**

*/s/ A. Paige Caraway*

A. Paige Caraway
120 18th Street South, Suite 101
Birmingham, AL 35233
Tel.:    (205) 983-8652

*Counsel to Certain CAEv2 Claimants*

**THE DILORENZO LAW FIRM, LLC**

*/s/ Joel L. Dilorenzo*

Joel L. Dilorenzo
505 20th Street North # 1275
Birmingham, AL 35203
Tel:    (205) 212-9988

*Counsel to Certain CAEv2 Claimants*

**BARON & BUDD PC**

*/s/ Andrew Gardener*

Andrew Gardener
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel:    (214) 521-3605

*Counsel to Certain CAEv2 Claimants*

**ANAPOL WEISS**

*/s/ Thomas Anapol*

Thomas Anapol
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel:    (215) 735-1130

*Counsel to Certain CAEv2 Claimants*

**ABRAHAM, WATKINS, NICHOLS, SORRELS, AGOSTO & AZIZ**

*/s/ Muhammad S. Aziz*

Muhammad S. Aziz
800 Commerce
Houston, TX 77002
Tel:    (713) 222-7211

*Counsel to Certain CAEv2 Claimants*

**LAW OFFICE OF L. PAUL MANKIN APC**

*/s/ L. Paul Mankin*

L. Paul Mankin
4655 Cass Street
Suite 410
San Diego, CA 92109
Tel:    (800) 219-3577

*Counsel to Certain CAEv2 Claimants*