**SO ORDERED: June 9, 2023.**



**Jeffrey J. Graham**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| AEARO TECHNOLOGIES LLC, | ) | Case No. 22-02890-JJG-11 |
| | ) | |
| Debtor. | ) | |
| —————————————————— | ) | |
| IN RE: | ) | |
| | ) | |
| AEARO LLC, | ) | Case No. 22-02891-JJG-11 |
| | ) | |
| Debtor. | ) | |
| —————————————————— | ) | |
| IN RE: | ) | |
| | ) | |
| AEARO INTERMEDIATE LLC, | ) | Case No. 22-02892-JJG-11 |
| | ) | |
| Debtor. | ) | |
| —————————————————— | ) | |
| IN RE: | ) | |
| | ) | |
| AEARO HOLDING LLC, | ) | Case No. 22-02893-JJG-11 |
| | ) | |
| Debtor. | ) | |
| —————————————————— | ) | |

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| AEARO MEXICO HOLDING CORP., | ) | Case No. 22-02894-JJG-11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| IN RE: | ) | |
| | ) | |
| CABOT SAFETY INTERMEDIATE LLC, | ) | Case No. 22-02895-JJG-11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| IN RE: | ) | |
| | ) | |
| 3M OCCUPATIONAL SAFETY LLC, | ) | Case No. 22-02896-JJG-11 |
| | ) | |
| Debtor. | ) | |

## ORDER DISMISSING BANKRUPTCY CASES

This matter comes before the Court on the: (1) *Joint Motion to Dismiss the Debtors' Bankruptcy Cases Pursuant to Bankruptcy Code Section 1112(b)* filed by the Official Committee of Unsecured Creditors for Tort Claimants—Related to the Use of Combat Arms Version 2 Earplug (the "CAE Committee") and numerous other law firms representing Combat Arms Version 2 Earplug plaintiffs (respectively, the "CAE Motion" and "CAE Movants"); (2) *Amended Motion to Dismiss* filed by the United States Trustee (respectively, the "UST Motion" and "UST"); and (3) *Motion to Appoint a Trustee Under 1112(b)(1), or Alternatively for Dismissal* filed by the Official Committee of Unsecured Creditors for Tort Claimants—Related to Use of Respirators (respectively the "Respirator Motion" and "Respirator Committee") (collectively, the moving parties shall hereinafter be referred as the "Movants" and their motions as the "Motions") and the *Omnibus Objection to Motions to Dismiss*

2

*Chapter 11 Cases* (the "Objection") filed by Debtors Aearo Technologies LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, Aearo Mexico Holding Corp., Cabot Safety Intermediate LLC, and 3M Occupational Safety LLC and ("Aearo" or the "Aearo Entities"). Together, the Movants argue that the Aearo Entities' bankruptcy cases were not filed in good faith and that "cause" therefore exists under 11 U.S.C. § 1112(b) to either dismiss the petitions or, per the Respirator Motion, appoint a Chapter 11 trustee.

The Court conducted a five-day evidentiary hearing on the Motions beginning on April 19, 2023 (the "MTD Hearing"). Having fully considered the submissions by the parties and the arguments and evidence presented to the Court at the MTD Hearing,[1] the Court hereby **GRANTS** the Motions to the extent they seek dismissal of the Aearo Entities' Chapter 11 cases but **DENIES** the Respirator Committee's request to appoint a Chapter 11 Trustee.

## Venue and Jurisdiction

The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 1334(b) and 157(b) as well as the Standing Order of Reference by United States

---

[1] Some of the Court's factual findings as to the Motions derive from a three-day evidentiary hearing on Aearo's request for injunctive relief (the "PI Hearing") in Adversary Proceeding No. 22-50059. The Court denied that request by Order dated August 26, 2022 (the "PI Order"). By agreement of the CAE Movants and Aearo, without objection by the Respirator Committee or the UST, the entire evidentiary record from the PI Hearing was admitted into evidence for purposes of the MTD Hearing. The PI Order is currently on direct appeal to the Seventh Circuit Court of Appeals. The Seventh Circuit has heard oral argument but has yet to issue a decision as of the date of this Order.

3

District Court for the Southern District of Indiana dated July 11, 1984. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Factual and Procedural Background**

On July 26, 2022 (the "Petition Date"), each of the Aearo Entities filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code (the "Code"). The cases are being jointly administered under the "lead" case of Aearo Technologies LLC, Case No. 22-2890. The Aearo Entities are each operating as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Code.

During the Aearo Entities cases, the Court has, among other things, authorized mediation, although no resolution among the parties has been reached.[2] To date, the Aearo Entities have also not yet proposed plans of reorganization, although the Court has extended their exclusive right to do so.

<u>Aearo and 3M</u>

Aearo is headquartered in, and has operated out of, Indianapolis, Indiana in one form or another for over forty years. The Aearo Entities are, with one exception, limited liability companies and are each organized under the laws of Delaware.

---

[2] As of the MTD Hearing, bankruptcy mediation remained ongoing—at least according to the mediators themselves—with one significant caveat: on April 7, 2023, the CAE Committee filed its *Motion to Modify the Chapter 11 Mediation Order to Remove the CAE Committee as a Mediation Party* wherein it represents that its settlement negotiations with Aearo have reached an impasse. The Court has not yet ruled on that motion, as the scheduled hearing on it has been continued by the parties' agreement, pending resolution of the Motions.

4

Aearo currently employs approximately 330 employees. Only Aearo Technologies LLC is currently operating; the remaining six Aearo Entities do not actively conduct business, have no employees, and have nominal assets. Aearo currently manufactures and sells custom noise, vibration, thermal, and shock protection, primarily serving the aerospace, commercial vehicle, heavy equipment, and electronics industries. Aearo used to manufacture, among other things, hearing protection devices.

In the late 1990s, Aearo designed a product called the Combat Arms earplug. The product was designed to afford users the ability to hear voices but block or reduce loud noises such as gunfire. After noise reduction rating testing in 1999 and 2000, Aearo began selling Combat Arms earplugs in 2000. Aearo eventually designed and manufactured an earplug sold to the United States military under the name Combat Arms Earplug Version 2 (the "CAEv2") and to civilian consumers under the name Arc Plug (the CAEv2 and Arc Plug, collectively, the "CAEv2").

3M Corporation ("3M") is a large multinational technology and manufacturing company that develops products across a wide range of markets including pharmaceuticals, chemicals, digital imaging and sound technology, office supply and consumer goods. Many of 3M's products, such as Post-it Notes and Scotch Tape, are ubiquitous. 3M is incorporated under the laws of Delaware and headquartered in St. Paul, Minnesota.

3M acquired the Aearo Entities in April of 2008 through a stock purchase for approximately $1.2 billion. For the first two years following the acquisition, Aearo's

business remained separate from 3M.  This changed in 2010, as Aearo transferred its Head, Eye, Ear, Hearing and Face Safety business, including the CAEv2 business, to 3M (the "Upstream").  The Upstream generated a receivable on Aearo's books of approximately $965 million that remains unpaid and for which Aearo has made no demand.[3]  After the Upstream, 3M continued to manufacture, market, and sell the CAEv2 until 2015.[4]  Approximately 80% of all sales relating to the CAEv2 occurred prior to the Upstream.  It is unclear whether 3M assumed any liabilities from Aearo relating to the Upstream or if such liabilities remained with Aearo.

Aearo became much more integrated into 3M after the Upstream, relinquishing many "back office" functions to 3M.  Pursuant to a Shared Services Agreement (the "SSA"), 3M agreed to provide, among other things, legal, accounting and insurance services to Aearo in exchange for a fee.  3M has not charged Aearo for services under the SSA since 2016.

In 2016, relators filed a *qui tam* action styled as *United States ex rel. Moldex-Metric, Inc. v. 3M Company*, Case No. 1601533.  The action was dismissed by stipulation in July of 2018, following execution of a settlement agreement and 3M's payment of $9,100,000 to the United States thereunder.  Shortly thereafter, servicemembers began to file lawsuits against Aearo and/or 3M alleging defects in, and injuries related to their use of, the CAEv2.

---

[3]  The $964,644,232 receivable is a gross number.  Aearo's books also show a $325,652,611 debt owed to 3M, resulting in a net receivable of $639,292,621.
[4]  There were less than $100 in CAEv2 sales in 2016.

<u>The MDL</u>

On April 3, 2019, approximately 700 CAEv2 lawsuits were consolidated into multidistrict litigation (the "MDL") before the Honorable M. Casey Rodgers in the United States District Court for the Northern District of Florida (the "MDL Court"). Several of the Aearo Entities and 3M are co-defendants in the MDL and in approximately 2000 CAEv2 lawsuits pending in the state courts of Minnesota (the MDL and Minnesota actions, collectively, the "CAEv2 Actions"). The CAEv2 Actions allege that the CAEv2 devices manufactured, distributed, and sold by Aearo and/or 3M were defective, resulting in hearing loss and related hearing defects such as tinnitus. The purported design flaws at issue in the CAEv2 Actions allegedly date to a period prior to 3M's acquisition of Aearo.

The Court notes that most, though not all, of the claims filed in the CAEv2 Actions assert that 3M and Aearo are jointly and severally liable. Some of the claims, however, have been asserted against only 3M.

What began as a trickle of suits eventually became a tsunami. To say that the MDL is large is an understatement of epic proportions. According to a May 15, 2023, statistics report by the United States Judicial Panel on Multidistrict Litigation, the MDL has 255,500 actions now pending,[5] down from a historical high

---

[5] The parties have generally referred to the MDL as having roughly 230,000 active cases during the various hearings in the Aearo Entities' bankruptcy cases. Given that the MDL has an administrative docket containing unvetted claims and cases have been filed against 3M post-petition, it is not entirely surprising that the parties' count of pending lawsuits differs from the figure reported by the United States Judicial Panel on Multidistrict Litigation.

of almost 336,000.[6]  The MDL is the largest in history by an order of magnitude and represents a staggering 30% of cases currently pending in the federal district courts.

As part of the MDL process, 27 plaintiff lawsuits were designated as "bellwethers."  Of that group, eight plaintiffs' claims were dismissed prior to trial. As to the remaining plaintiffs, the parties have participated in 16 trials.  Ten of the bellwether trials resulted in verdicts for 12 claimants, and the remaining six resulted in verdicts in favor of 3M and Aearo.  The verdicts, each of which imposed joint and several liability against 3M and Aearo, ranged from $1.7 million to $77.5 million.[7]  Appeals are pending in five of the bellwether cases, and to date, no payment has been made to any of the plaintiffs who have obtained a verdict in their favor. Attempts to negotiate a settlement in the MDL have started, faltered, restarted, ended, and recently sprung back to life.[8]

---

[6]  By way of comparison, the next largest currently pending MDL is the Johnson & Johnson talcum powder litigation, with 37,543 actions pending as of May 15, 2023.

[7]  The Court notes that some of the more eye-popping verdicts rendered in the bellwethers consist largely of punitive damages.  For instance, the $77.5 million verdict includes $72.5 million in punitive damages and $5 million in compensatory damages.  Another verdict in the amount of $110 million (for two plaintiffs) consists of $40 million in punitive damages and $15 million in compensatory damages for each plaintiff.

[8]  As of the date of the MTD Hearing, mediation in the MDL had ceased per the MDL Court's order.  In the weeks following conclusion of the MTD Hearing, however, the MDL Court ordered, at the plaintiffs' request, that mediation in the MDL resume.  The Court finds it curious that weeks after the CAE Committee asked to withdraw from the mediation in this Court (asserting it had concluded there could be no meeting of the minds), plaintiffs moved to restart mediation in the MDL.  But mediation is a good thing, regardless of where and when it occurs.  And perhaps a change of scenery has been beneficial, as the MDL Court recently ordered 3M's CEO and every member of the MDL plaintiffs' settlement committee to attend a mediation session in late May, finding the MDL mediation discussions had reached a "critical juncture."

The MDL Court has selected several "waves" of cases, approximately 500 at a time, to engage in active discovery. Three such waves have been created to date which, after accounting for voluntary dismissals, include approximately 1,200 cases in active discovery. As of the Petition Date, the MDL Court was poised to remand for trial some, or all, of those 1,200 cases to the district courts from which they originated.

At the outset of its bankruptcy, Aearo requested that the Court enjoin the CAEv2 Actions as to 3M. The Court denied the request in the PI Order, finding that continuation of the CAEv2 Actions as to 3M posed no material threat to Aearo and the bankruptcy estates. The Court's conclusion was based largely on the terms of a funding agreement, described more fully below, that Aearo and 3M executed immediately prior to the Petition Date.

Although Aearo's arguments came up short, litigation against 3M has largely been stayed anyway due to developments in the MDL. Further activity in the CAEv2 Actions, with a few exceptions, has largely ceased for two reasons. First, various appeals related to the MDL bellwethers are currently pending—and proceeding by agreement—before the Eleventh Circuit Court of Appeals. One such appeal, relating to a government contractor's defense, could potentially moot the entire MDL. Second, the MDL Court issued an Order dated December 22, 2022, whereby it sanctioned 3M and precluded it from shifting any liability in the MDL to the Aearo Entities.[9] The MDL Court certified this Order as an appealable

---

[9] *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, Case No. 3:19md2885-MCR-HTC, Docket No. 3610.

interlocutory order and stayed the MDL proceedings pending resolution of that appeal.

As of the Petition Date, Aearo had not actively participated in the MDL despite being a named defendant. Instead, 3M undertook full responsibility for the defense of the CAEv2 Actions. 3M has also exclusively borne all defense costs relating to the MDL—in the approximate amount of $350 million for both itself and Aearo—from the inception of the CAEv2 Actions through the Petition Date. While there was testimony at the MTD Hearing that 3M is under no obligation to continue to pay Aearo's defense costs, no evidence suggests that 3M has threatened to discontinue such support.

On July 27, 2022, the Court conducted a "first day hearing" in the Aearo Entities' bankruptcy cases. At that hearing, counsel for the Aearo Entities, Kirkland & Ellis ("K&E"), offered this introduction to the Court:

> [T]his is not a liquidation. This is a reorganization of an operating business. And this is not about funded debt or [an] operational restructuring. We're here to address the mass tort issues this company faces . . . in [the Pending Litigation]. . . . We're seeking to use the Chapter 11 tools where the debtors believe the MDL has fallen short. It's not that the MDL did something wrong necessarily, it's that the process has failed the debtors, and frankly, we believe failed the plaintiffs.

Transcript of Miscellaneous Motions by Debtors, July 27, 2022 A.M. Session, at page 13, lines 1-18. Aearo's counsel further explained that the "crux of the problem" in the MDL is that many of the asserted claims have not been vetted and, in Aearo's opinion, are potentially unsupported and without merit. Counsel complained that after three years of litigation and reportedly $350 million in defense costs, "[t]his

quagmire . . . has led to massive market confusion regarding the size of these liabilities.  The plaintiff's lawyer said it's over a trillion dollars.  Analysts have published reports that say it's between $1.8 billion and $1.55 trillion.  None of these is more than a guess. It certainly can't be right." *Id*. at 21, lines 14-19.

Counsel's message is consistent with statements made by 3M.  For instance, in a call with stock analysts on the same day that the Aearo Entities filed their petitions, 3M's Chief Executive Officer announced that "[t]he [MDL] process and the highly variable outcomes it has generated, has not provided certainty or clarity" and because "[w]e believe that litigating these cases individually could take years, if not decades," 3M "made the decision to adopt a new legal strategy" . . . "to use well-established Chapter 11 procedures to resolve this litigation. . . ." Similarly, in 3M's most recent annual Form 10-K, filed earlier this year with the United States Securities and Exchange Commission, 3M stated:  "Following conclusion of the bellwether trial process and unsuccessful settlement discussions, and with another 2,000 cases being prepared for trial while the company's appeals are still pending, the Aearo entities and the company adopted a change in strategy for managing these litigation liabilities that led to the Aearo entities initiating the Chapter 11 proceedings."

<u>Respirator Actions</u>

Several of the Aearo Entities and 3M have also been named as defendants in a smaller number of claims related to alleged personal injury from workplace exposures to asbestos, silica, coal mine dust, or other occupational dusts in

11

connection with the use of Aearo's mask and respirator products (the "Respirator Actions"). Aearo has an agreement with Cabot CSC LLC, a co-defendant in the Respirator Actions, whereby Cabot CSC LLC has agreed to indemnify Aearo for the Respirator claims in exchange for quarterly payments of $100,000. Aearo has made, and continues to make, these quarterly payments. Nonetheless, Aearo has booked $46 million in liability and defense costs related to the Respirator Actions. (the "CAEv2 Actions" and "Respirator Actions," collectively, the "Pending Actions").

<u>The Funding Agreement</u>[10]

Beginning in March 2022, 3M began exploring strategic alternatives to the MDL via what was dubbed "Project Crane." Among those alternatives was a chapter 11 bankruptcy for the Aearo Entities. By June 7, 2022, the Project Crane team had presented and recommended to the 3M Board of Directors an Aearo bankruptcy timeline, culminating in "final approval" by the 3M Board at its July meeting of an Aearo bankruptcy filing and announcement on July 36, 2022—a date that coincided with 3M's next earning call. At the time of the 3M Board's decision, no one from Aearo was a member of Project Crane.

Thereafter, 3M appointed two disinterested directors to Aearo's Board of Directors: Jeffrey Stein and Roger Meltzer (the "Independent Directors").[11] The Independent Directors were tasked with negotiating the terms under which 3M would fund a chapter 11 bankruptcy, as well as a claims trust for both CAEv2 and

---

[10] The PI Order contains an extensive discussion of the Funding Agreement. The Court has included only the high points here, sparing the reader a full retelling.

[11] Prior to these appointments, Aearo's Board consisted entirely of current or former 3M employees.

Respirator claims. A draft funding agreement—circulated by K&E serving as MDL counsel for 3M—became the framework for negotiations between 3M and the Independent Directors.

Stein testified at the PI Hearing that the negotiations among 3M and the Independent Directors were "vigorous." Hyperbole aside, Aearo did obtain several significant concessions from 3M. The salient modifications to the draft funding agreement are set forth below:

- 3M made a commitment of $1.24 billion, including $240 million for funding a chapter 11 case and a trust of $1 billion for Pending Actions, the commitment being uncapped and funded inside or outside of bankruptcy;

- Aearo would indemnify 3M but not assume liabilities, paragraph added to funding agreement where a "Permitted Funding Use" would be for 3M to pay any liability of the Aearo Entities to 3M, including indemnification obligations;

- Funding not conditioned on extension of the stay or any other requests; Aearo must only abide by a budget;

- Events of default no longer include extension of the automatic stay, conversion or dismissal; 3M does not have right to terminate agreement; and

- No financial conditions on 3M other than 3M to use commercially reasonable efforts to maintain credit rating.

These changes were presented to the Aearo Board on July 23, 2022, at which time the Board resolved to execute the funding agreement. The Independent Directors advised that Aearo "[s]hould not take the risk Bankruptcy Court declines to extend the automatic stay, or other bankruptcy [events of default], leaving the Aearo Entities marooned in chapter 11 proceeding without funding."

13

3M and Aearo executed a final funding agreement on July 25, 2022 (the "Funding Agreement"). Per the Funding Agreement's Recitals, 3M has committed to "satisfy all of the respective Aearo Entities' Liabilities specified herein on the terms set forth herein, such that each of the respective Aearo Entities will have assets with a value greater than its Liabilities and will have the financial capacity to satisfy its obligations as they become due in the ordinary course of its business . . . ." An initial $1 billion was committed to fund a trust to compensate allowed CAEv2 and Respirator claims, as well as $240 million to fund administration of the Aearo Entities' Chapter 11 cases.

In exchange for this commitment, Aearo agreed to indemnify 3M and its non-debtor affiliates for liabilities related to the Pending Actions. 3M's commitment under the Funding Agreement, both as to the Chapter 11 case expenses and the trust, is on an uncapped basis. The Funding Agreement is not a loan, as it does not impose any real repayment obligations on Aearo.

The Funding Agreement is not without condition, however. 3M is obligated to pay Aearo's Chapter 11 administrative expenses and indemnification obligations only after Aearo has exhausted most of its own assets, including most of its cash reserves.[12] Significantly, however, 3M's obligations under the Funding Agreement

---

[12] The Funding Agreement provides that the Aearo Entities must exhaust nearly all their assets before 3M's funding commitment is triggered. At the PI Hearing, Aearo focused only on its obligation to use its cash reserves and available insurance under the Funding Agreement and did not address whether there are other assets—*i.e.*, physical assets—that might need to be liquidated prior to funding or whether the liquidation of such assets, if any, would impact Aearo's estate or ability to reorganize. This issue was also not directly addressed at the MTD Hearing. But

14

are not conditioned on Aearo seeking or obtaining a stay of the Pending Actions as to 3M, nor is dismissal of the cases or the appointment of a Chapter 11 trustee an event of default.

The Independent Directors reviewed 3M's finances and concluded that 3M will be able to satisfy the payments provided for under the Funding Agreement. 3M's most recent SEC filings show it to be strong financially with no going concern warnings. Specifically, Stein testified at the PI Hearing that he was confident of 3M's financial wherewithal and believed that the Funding Agreement provided a "clear path" to restructuring the Aearo Entities even absent a stay of the Pending Actions.

<u>Insurance</u>

3M manages two insurance programs that might cover the CAEv2 Actions: the "3M Tower" and the "Aearo Legacy" programs. The 3M Tower provides $1.05 billion in coverage for claims made during the applicable policy period of March 1, 2018, to March 1, 2019. 3M pays the premiums related to, and is the primary insured under, the 3M Tower; however, Aearo is named as an additional insured. On June 28, 2019, 3M provided notice to its insurers of the CAEv2 Actions, and these are the only claims for which notice has been given. The 3M Tower coverage is otherwise fully available and free of any other demands.

The Aearo Legacy provides $550 million in coverage. The policies were paid for by Aearo and existed prior to 3M's purchase of Aearo in 2008. The coverage

---

what was made clear at the MTD Hearing is that under the terms of the Funding Agreement, Aearo is permitted to retain $5 million in cash reserves.

provided by the policies covers "occurrences" during the years 1997 to 2008.  Aearo is the named insured.  On June 28, 2019, 3M provided notice to the insurers in the Aearo Legacy program of the CAEv2 Actions.

The only payments made, to date, by any insurer have come from an Aearo Legacy insurer.  Liberty Mutual Insurance Company issued four checks of $1,000,000 each to 3M and the Aearo Entities.  Liberty Mutual issued these checks on February 17, 2022, as partial payment to 3M of a verdict issued in the MDL. 3M has not resolved certain issues related to Liberty Mutual's coverage and, thus, has not negotiated the checks.

<u>Aearo's and 3M's Financial Condition</u>

Aearo had $108 million in direct sales in 2021.  In the three-year period from January 2020 to January 2023, its revenue grew by 13%, and its current annual sales are projected to rise to $150 million in 2023. Aearo's president, Matthew Blaisdell, testified at the MTD Hearing that Aearo has always had the ability to pay its employees and vendors and to meet its other financial obligations. Aearo's monthly post-petition operating reports show positive cash flow.

Aearo's balance sheet and schedules reflect total accrued liabilities for CAEv2 Actions of $1 billion; total accrued liabilities for Respiration Actions of $46 million, and total accrued legal fees of $200 million. Aearo's trade debt is roughly $2.24 million (excluding the payable owed to 3M).  This contrasts with Aearo's

assets, which are roughly $43.7 million (excluding the 3M receivable) in cash[13],
inventory, furniture, fixtures, equipment, and real and personal property; and at
least a $1 billion commitment from 3M under the Funding Agreement.

Not yet discussed is Aearo's 3M receivable in the approximate net amount of
$640 million.  Much was made at the at the MTD Hearing as to Aearo's seeming
refusal to collect this receivable. Aearo insists that if it did so, the funds would be
subject to the exhaustion requirement under the terms of the Funding Agreement;
however, it is protected as a receivable.  The Court does not necessarily question
this logic, but the existence of the receivable is at least worth noting when
discussing Aearo's financial condition. Regardless, Aearo is solvent using a balance
sheet analysis and a cash flow analysis.

Prior the execution of the Funding Agreement, neither 3M nor Aearo
reflected any amount of accrued liabilities on their books for CAEv2 Actions because
such liabilities were deemed "not probable or reasonably estimable."  The Court
notes that the CAEv2 claimants themselves asserted their claims were worth
trillions of dollars per their initial disclosures in the MDL; neither Aearo nor 3M,
however, have booked liability in this amount.  At the MTD Hearing, both Blaisdell
and Aearo's Chief Restructuring Officer, John Castellano, testified that they were
unaware of the CAEv2 claimants' estimation. Castellano instead testified that he

---

[13]  This figure includes roughly $30 million of cash belonging to Aearo but held in a
3M account as of the Petition Date.  Those funds were transferred to Aearo's bank
account after the first day hearings these Chapter 11 cases.

believed the value of all CAEv2 Actions to be less than $1 billion, and he's remained steadfast in his belief that 3M has the wherewithal to fund pay all valid claims.

The genesis of the CAEv2 Actions' $1 billion valuation comes from Bates White, LLC ("Bates White").  Prior to the Petition Date, Bates White provided an analysis of the amount of Aearo and 3M's CAEv2 liability within the context of a bankruptcy case.  That analysis estimated liability to be approximately $1 billion.  It was only then that 3M started to book a $1 billion contingent liability for the CAEv2 Actions.  Notably, neither 3M nor Aearo has performed any analysis of potential CAEv2 liability outside of bankruptcy even though the Funding Agreement, by its terms, applies regardless of whether Aearo is in bankruptcy.

In 2022, 3M and its subsidiaries generated over $5.7 billion in sales.  As of December 31, 2022, 3M's book equity values exceeded $14.7 billion.  The firm was number 102 on the Fortune 500 list for 2022 and enjoys an "A" investment credit rating.  In 2022, 3M paid over $3.2 billion in dividends to shareholders and spent $1.4 billion in stock repurchases, an increase over the prior year.  After paying these amounts, 3M had cash and cash equivalents of over $3.6 billion.

### Discussion and Decision

Together, the Movants assert that "cause" exists to dismiss the Aearo Entities' cases under § 1112(b) of the Code.  Aearo rejects this assertion and also argues that the Motions are barred by laches.  Finally, the Respirator Committee favors the appointment of a Chapter 11 trustee as a remedy under § 1112(b) rather than dismissal. The Court will address these arguments in order.

<u>11 U.S.C. § 1112(b)</u>

Section § 1112 of the Code provides that "on request of a party in interest, notice and hearing the court shall . . . dismiss a case under this chapter . . . for cause unless the court determines that the appointment under § 1104(a) of a trustee or an examiner is in the best interests of the creditors and the estate." A bankruptcy court possesses broad discretion to dismiss a chapter 11 bankruptcy case for "cause" under § 1112(b). *In re Woodbrook Assocs.*, 19 F.3d 312, 316 (7th Cir. 1994). The initial burden to demonstrate "cause" under § 1112(b) lies with the movant, and that burden must be shown by a preponderance of the evidence. *In re Draiman*, 450 B.R. 777, 826 (Bankr. N.D. Ill. 2011).

However, "[o]nce the movant shows 'cause,' the burden shifts to the debtor to establish one of two exceptions in section 1112(b)." *Id*. Section 1112(b)(2) provides that the court may not convert or dismiss a Chapter 11 case if it is not in the best interest of the creditors, and:

> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes . . . within a reasonable period of time; and
>
> (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—
>
>> (i) for which there exists a reasonable justification for the act or omission; and
>>
>> (ii) that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b)(2).

A chapter 11 case can be dismissed at any time. *Woodbrook*, 19 F.3d at 317. "Creditors need not wait until a debtor proposes a plan or until the debtor's

exclusive right to file a plan has expired." *Id*. Likewise, they do not need to "incur the added time and expense of a confirmation hearing on a plan they believe cannot be effectuated." *Id*. "The very purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless." *Id*.

"Cause" Under § 1112(b)

The Supreme Court has stated that the "Code standardizes an expansive (and sometimes unruly) area of law and it is our obligation to interpret the Code clearly and predictably . . . ." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012).  Fulfilling that solemn obligation here is no easy task.

Section 1112(b) enumerates 16 bases of "cause" that justify dismissal:

(A)     substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(B) gross mismanagement of the estate;

(C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;

(D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;

(E) failure to comply with an order of the court;

(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

20

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required under chapter 123 of title 28;

(L) revocation of an order of confirmation under section 1144;

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

11 U.S.C. § 1112(b)(4).  It is well established that this list is not exclusive.  *See In re Int'l Oriental Rug Ctr., Inc.*, 165 B.R. 436, 442 (Bankr. N.D. Ill. 1994).

In addition to these explicit examples of "cause," most courts generally agree that a case should also be dismissed under § 1112(b) if it was not filed in good faith.[14]  *See, e.g., In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999); *In re Trident Assocs. Ltd. P'ship*, 52 F.3d 127, 130–31 (6th Cir. 1995); *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994); *Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988); *In re*

---

[14]  This is not to say that the good faith standard has been universally accepted.  For instance, in *In re Victoria Limited Partnership*, 187 B.R. 54 (Bankr. D. Mass. 1995), Judge Queenan concluded that the legislative history of § 1112(b) does not support its application.  *Id.* at 60.  In Judge Queenan's estimation, the good faith standard is "an amorphous gestalt, devoid of reasoning and impenetrable to understanding."  *Id.* at 62.  This criticism is interesting as Judge Queenan had previously analyzed good faith and found it was often used under § 1112(b) to protect the jurisdictional integrity of bankruptcy courts.  *See In re Bible Speaks*, 65 B.R. 415, 422 (Bankr. D. Mass. 1986).  The Court does not wholly disagree with Judge Queenan's criticism but must follow binding Seventh Circuit authority discussed below.

*Little Creek Devel. Co.*, 779 F.2d 1068, 1071–72 (5ᵗʰ Cir.1986).[15]  The Seventh

Circuit, as detailed below, stands among these courts.

Despite this consensus, however, there is no universally accepted definition

for good faith in the context of § 1112(b).  For its part, the Seventh Circuit has

offered some broad suggestions as to the term's meaning but has not articulated a

definitive standard.  Specifically, it is unclear under existing Seventh Circuit

caselaw whether it is bad faith for a financially healthy debtor to seek Chapter 11

relief.  In the absence of a governing standard, the Court is compelled to cast a wide

net into this Circuit's caselaw to capture a definition, starting with a trio of Seventh

Circuit decisions that discuss good faith.

The first of these is *In re Madison Hotel Associates*, 749 F.2d 410, 426 (7ᵗʰ Cir.

1984), in which Judge Coffey observed that it is "generally recognized that 'good

faith' is a threshold prerequisite for securing Chapter 11 relief" and that the lack of

good faith constitutes sufficient cause for dismissal.  *Id*. at 426 (citing *In re BBT*, 11

B.R. 224, 235 (Bankr. D. Nev. 1981); *In re Victory Constr. Co.*, 9 B.R. at 558; *In re

Mildevco, Inc.*, 40 B.R. 191, 193 (Bankr. S.D. Fla. 1984); *In re Gregory*, 39 B.R. 405,

407 n. 1 (Bankr. M.D. Tenn. 1984); *In re Lotus Inv., Inc.*, 16 B.R. 592, 594–95

(Bankr. S.D. Fla. 1981)).

While some of the cases cited by Judge Coffey make a passing reference to

the debtor's economic reality or financial distress, none of the cases specifically

address whether an otherwise healthy or solvent company has a need for

---

[15]  For comprehensive historical overviews of the good faith standard, see *In re
Victory Constr. Co., Inc.*, 9 B.R. 549 (Bankr. S.D. Cal. 1981) and *Bible Speaks.*

rehabilitation or is an appropriate Chapter 11 debtor.  Nor do any of these cases discuss whether the mere existence of pressing litigation, mass or otherwise, justifies a debtor seeking Chapter 11 relief.  However, in concluding that the debtor's case was filed in good faith, Judge Coffey noted that an entity experiencing "cash flow problems" is entitled to seek Chapter 11 protection, thereby allowing it to "return to the status of a viable entity."  *Id*. at 426.

Next is *In re Jartran, Inc.*, 886 F.2d 859 (7th Cir. 1989).  Writing for the court, Judge Cudahy reiterated that a lack of good faith constitutes cause for dismissal under § 1112(b).  Factually, the case stands for the proposition that serial Chapter 11 filings do not constitute bad faith *per se*.  But the cases otherwise cited by the court, like the cases cited in *Madison Hotel*, are factually distinct from the facts presented here.  Nevertheless, it is worth noting that the debtor in *Jartran* was permitted to proceed with its second Chapter 11 case given evidence that it was "unable to continue operating as a going concern."  *Id*. at 868.

The third in the trio is *In re James Wilson Associates*, 965 F.2d 160 (7th Cir. 1992).  There, Judge Posner reiterated that § 1112(b) "authorizes" a bankruptcy judge to dismiss a bankruptcy case for want of good faith. But he also offered the following:

> What should count as bad faith in this setting is unclear. It is not bad faith to seek to gain an advantage from declaring bankruptcy—why else would one declare it?  One might have supposed that the clearest case of bad faith would be filing for bankruptcy knowing that one was not bankrupt, but the Bankruptcy Code permits an individual or firm that has debts to declare bankruptcy even though he (or it) is not insolvent. *In re Johns–Manville Corp.*, 36 B.R 727, 732 (Bankr. S.D.N.Y. 1984); [Douglas G.] Baird & [Thomas H.] Jackson, [*Cases,*

23

*Problems, and Materials on Bankruptcy*] at 86-129 (These are usually cases of impending insolvency). The clearest case of bad faith is where the debtor enters Chapter 11 knowing that there is no chance to reorganize his business and hoping merely to stave off the evil day when the creditors take control of his property.

*Id*. at 170 (citing *Carolin Corp*, 886 F.2d at 700-03).

The Seventh Circuit, however, found "no indication of this here," finding instead that the debtor sought bankruptcy protection after defaulting on its two mortgages and the appointment of a receiver. *Id*. at 171. In concluding that the case was filed in good faith, Judge Posner noted that the litigation that precipitated the filing had rendered debtor insolvent. *Id*.

It is clear from *James Wilson* and, for that matter, the Code itself, that a debtor need not be insolvent to seek Chapter 11 protection. *See also Int'l Oriental Rug Ctr.*, 165 B.R. at 442, 444. What is less clear, however, is how close to insolvency a debtor must be, if at all, to be acting in good faith. Judge Posner took at least some notice of cases that found good faith where the debtor's insolvency was "impending." *Jartran* and *Madison Hotel* also each involved a debtor that was insolvent or was clearly facing some degree of tangible financial difficulty. That said, none of these cases explicitly hold that financial distress is a *requirement* of good faith.

Having failed to capture a definitive definition of good faith from the Seventh Circuit, the Court casts an even broader net in the hope of landing instructive caselaw within the Circuit, starting with Judge Wedoff's thoughtful analysis in *In re N.R. Guaranteed Retirement, Inc.*, 112 B.R. 263 (Bankr. N.D. Ill. 1990). Judge

24

Wedoff begins his discussion with the historical background for a good faith filing standard and with the Seventh Circuit's recognition of a good faith standard under § 1112(b).  *Id.* at 270-71.  He then aptly observes that "[t]eaching of such substantial weight must, of course, be honored, but the teaching is hard to apply."  *Id*. at 271.

Citing *Little Creek,* 779 F.2d at 72-73 and *In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987), both of which articulated a list of subjective and objective factors that have at least historically supported a finding of "bad faith," Judge Wedoff emphasizes that such factors are "entirely non-prescriptive."  *Id*. at 272.  He then laments that the absence of any definitive test or standard "understandably leads to frustration," an observation with which this Court concurs.  *Id*. at 271-72.

Given this state of the law, Judge Wedoff identifies four basic fact patterns that have emerged from the existing case law.  He writes: "[a] review of the Chapter 11 decisions in which lack of good faith in filing is cited as ground for relief suggests that, instead of a single good faith inquiry, the courts have actually responded to several distinct grounds for relief, stemming from different concerns and reflected in differing factual circumstances."  *Id*. at 272.  He further explains that "[b]y dealing with these grounds separately, it is possible to develop more consistent and predictable tests of 'cause' for dismissal or relief from the stay than the lists of good faith factors."  *Id*.

The first of these emergent fact patterns—the "improper impact on non-bankruptcy rights"—is the one most instructive to the case at hand:[16]

---

[16]    The other three fact patterns are: (1) the recent transfer of assets a/k/a "new debtor syndrome;" (2) the inability to reorganize; and (3) delay.  *Id*. at 273-77.  Judge

The most basic "good faith" ground for dismissal of a Chapter 11 case is that the filing is unnecessary. A truly unnecessary Chapter 11 case imposes improper burdens both on creditors and on the bankruptcy system. The creditors are arbitrarily required to accept rights in bankruptcy in place of their property rights under non-bankruptcy law (at the very least, the automatic stay is imposed upon them), and the bankruptcy system is required to waste its resources, possibly interfering with the processes of other court systems.

Bankruptcy courts have thus been willing to consider creditor's motions for relief on the ground that a particular Chapter 11 case was filed without need for relief. In *In re Johns-Manville . . .* , the court considered motions to dismiss filed on behalf of asbestos victims who allege that *Manville* had filed its bankruptcy simply in order to curtail its liabilities to them, without any need for bankruptcy protection. The court rejected this contention on the ground that debtor was in fact "in pressing need of economic reorganization." [*Id.*] at 738. In *In re Bible Speaks*, 65 B.R. 415 (Bankr. D. Mass. 1986), the court considered a motion to dismiss filed by a creditor who alleged that the state court litigation against the debtor was stayed by an unnecessary Chapter 11 filing. The bankruptcy court rejected this argument based on a finding that the creditor's claim "may well exceed the value of the Debtor's assets" and "poses a threat to the Debtor's continued existence." [*Id.*] at 426.

Although *Manville* and *The Bible Speaks* did not grant relief, the principle that they suggest that has been applied in a series of "supersedeas cases"—bankruptcy cases filed in order to obtain a stay, pending appeal, of a judgment entered against the debtor, where the debtor has failed to file a supersedeas bond. Although there was an apparent split of authority in early decisions dealing with this situation (see *In re Karum Group, Inc.*, 66 B.R. 456, 437 (Bankr. W.D. Wash. 1986)), there now appears to be a generally accepted rule:

> [A] Chapter 11 filing is in good faith and may be used to replace an appeal bond if the judgment against the debtor is so large that the debtor faces severe disruption of his business if enforcement of the judgment is not stayed. However, if the debtor has the ability to satisfy the judgment from non-business assets, then it is bad faith to attempt to use the bankruptcy laws to appeal without posting a bond.

---

Wedoff notes, however, that numbers (2) and (3) are already reflected in the explicit bases for caused enumerated in § 1112(b) and, as such, are redundant factors in a good faith analysis. *Id.* at 276-77.

> This rule would be equally applicable in situations like that of the *Manville* litigation.  If the debtor's business could continue unimpaired, without a bankruptcy filing, a creditor whose rights are impacted by the filing has "cause" for relief, independent of the other factors listed in the decisions on good faith in filing.

*Id*. at 272-73 (quoting *In re Holm*, 75 B.R. 86, 87 (Bankr. N.D. Cal. 1987)).

But Judge Wedoff also offers a caution given that a debtor need not be insolvent under the Code: "The 'cause' provisions of Sections 362(d) and 1112(b) should therefore not be applied to grant relief simply because the debtor cannot clearly articulate or convincingly prove its need for bankruptcy protection."  *Id*. at 273.

He further emphasizes that that the burden of proof is properly placed on the moving creditor.  "[A] Chapter 11 proceeding should be dismissed [due to its impact on non-bankruptcy rights] only if the debtor has the clear ability to survive without bankruptcy protection."  *Id*. (quoting *Holm*, 75 B.R. at 87).  In conclusion, Judge Wedoff holds that the moving creditor must establish that "the debtor has no need of bankruptcy protection and that the bankruptcy filing substantially impacts the creditor's non-bankruptcy rights."  *Id*.

*N.R. Guaranteed* is just one of several decisions within the Seventh Circuit that expands on the meaning of good faith in the context of § 1112(b).  Several bankruptcy judges, including Judges Schmetterer, Cox and Barnes, have each utilized a multifactor test to examine whether a petition was filed in good faith. *See, e.g., In re Bovino*, 495 B.R. 492 (Bankr. N.D. Ill. 2013) (J. Barnes); *In re Tekena USA, LLC*, 419 B.R. 341 (Bankr. N.D. Ill. 2009) (J. Cox); *In re South Beach Sec., Inc.*

27

341 B.R. 853, 856-57 (N.D. Ill. 2006) (citing *Int'l Oriental Rug Ctr., Inc.*, 165 B.R. at 436 (J. Schmetterer)).  For instance, the bankruptcy court in *Tekena* sets out 14 factors to consider:

> (1) [W]hether debtor has few or no unsecured creditors; (2) whether there has been previous bankruptcy filing by debtor or related entity; (3) whether there has been improper prepetition conduct by debtor; (4) whether petition effectively allows debtor to evade court orders; (5) whether debtor owes few debts to non-moving creditors; (6) whether petition was filed on eve of foreclosure; (7) whether foreclosed property is sole or major asset of debtor; (8) whether debtor lacks any ongoing business or employees; (9) whether there is no possibility of reorganizing; (10) whether debtor's income is insufficient to allow it to operate; (11) whether petition was filed despite lack of pressure from non-moving creditors; (12) whether case essentially involves resolution of two-party dispute; (13) whether debtor is corporation that was formed and received title to its major assets immediately before petition was filed; and (14) whether petition was filed solely to create automatic stay.

*Tekena*, 419 B.R. at 346 (citing *In re Grieshop*, 63 B.R. 657, 663 (N.D. Ind. 1986)).

But even Judge Schmetterer—who himself had once articulated a multifactor test in this context—later expressed reservations about such tests, noting that "neither *South Beach* nor *Int'l Oriental Rug Center* provide any framework for analyzing when some of the . . . factors indicate bad faith.  Congress has not specified any of the factors listed in *South Beach* and other cases constitute bad faith, and we as judges cannot rewrite Congress' intent."  *In re Strug-Division, LLC* (Bankr. N.D. Ill. 2007).[17]  He goes on:

---

[17]   Still later, Judge Schmetterer went further: "'Multifactor tests with no weight assigned to any factor are bad enough from the standpoint of providing an objective basis for a judicial decision; multifactor tests when none of the factor is concrete are worse.'"  *In re Meier*, Case No. 14-10105, WL 5426763, at *2 (Bank. N.D. Ill. October 21, 2014) (quoting *Marrs v. Motorola, Inc.*, 577 F.3d 783, 788 (7th Cir. 2009)).  Instead, he wrote, "the focus should be on the 'key test' of good faith, that is:

In ruling on a motion to dismiss for lack of good faith, courts must be mindful of, and attempt to preserve, the balance of interests fashioned by Congress under Chapter 11 of the Bankruptcy Code, including a policy of open access to the bankruptcy process. *See, e.g., In re Johns–Manville Corp.*, 36 B.R. 727, 735–37 (Bankr. S.D.N.Y. 1984). As opined in *In re Schlangen*, 91 B.R. 834, 837 (Bankr. N.D. Ill. 1988), the Court must be careful not to deny the protection of the Bankruptcy Code to a debtor whose legitimate efforts at financial rehabilitation may be hidden among derivative benefits (such as the delay of creditors resulting from the automatic stay) that, if viewed alone, might suggest bad faith.

The key test of good faith in Chapter 11 is whether the debtor has proposed or can propose a legally and economically feasible plan of reorganization. *See Marsch*, 36 F.3d at 828 ("The test is whether a debtor is attempting to unreasonably deter and harass creditors *or attempting to effect a speedy, efficient reorganization on a feasible basis.*") (emphasis added). In other words, the question is whether the case and possible plan serve a valid reorganizational purpose. *SGL Carbon*, 200 F.3d at 165. If not, then the case was filed only to harass and delay creditors, and therefore was filed in bad faith.

Of course, some factors listed in *South Beach* and other cases may be relevant to determine whether a viable plan of reorganization is in the offing. Absence of assets, lack of employees and negative cash flow may show that a plan is not economically or legally feasible. Pre-bankruptcy wrongdoing by the principals of a debtor may show them to be unreliable or incompetent managers, thereby casting doubt on any plan they propose.

*Id.* at 449.

After reviewing this caselaw, this Court reaches two conclusions. First, like Judge Schmetterer, the Court is unwilling to adopt a multifactor test to determine a debtor's good faith. The factors identified in cases like *Tekena* might be helpful in certain types of cases. But the Court is unwilling to strictly adopt or apply a

---

whether the debtor has proposed or can propose a legally and economically feasible plan or whether the case and possible plan can otherwise serve a valid reorganizational purpose." *Id.*

laundry list of unweighted factors in cases as complicated as these where only a handful of the list is even applicable. The Court is also mindful of the Seventh Circuit's express disdain for unweighted multifactor tests.

Second, in lieu of a multifactor test, the Court is inclined to conclude that good faith is better measured by whether the Chapter 11 case serves "a valid reorganizational purpose," see, e.g., *Madison Hotel Assoc's*, 749 F.2d at 425, and that a debtor's "need" for relief under the Chapter 11 is central to that inquiry. In reaching that conclusion, the Court agrees with this assessment from the Third Circuit:

> It is easy to see why courts have required Chapter 11 petitioners to act within the scope of the bankruptcy laws to further a valid reorganizational purpose. Chapter 11 vests petitioners with considerable powers—the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.—that can impose significant hardship on particular creditors. When financially troubled petitioners seek a chance to remain in business, the exercise of these powers is justified. But this is not so when a petitioner's aims lie outside those of the Code.

*In re Integrated Telecom Express, Inc.,* F.3d 108, 120 (3rd Cir. 2004) (quoting *SGL Carbon*, 200 F.3d at 165-66). *See also In re Liptak*, 304 B.R. 820, 828 (Bankr. N.D. Ill. 2004) ("[C]ourts have noted that focusing on such terms as good or bad faith in filing is misleading to some degree, as the question is really whether the debtor has presented a legitimate reorganizational objective within the scope of the Bankruptcy Code or rather has presented a 'tactical' reason unrelated to reorganization.") (citing *In re Huckfeldt,* 34 F.3d

829, 832 (8th Cir. 1994); *Marsch*, 36 F.3d at 828; and *N.R. Guaranteed*, 112 B.R. at 271).

In the Court's view, framing good faith in terms of Chapter 11's underlying goals serves to protect the bankruptcy court's jurisdictional integrity.  This protection of the bankruptcy court's jurisdiction is imperative.  The Court is ever mindful—and is often reminded by the Supreme Court— that bankruptcy court jurisdiction is not unlimited.  *See, e.g., Stern v. Marshall*, 564 U.S. 462 (2011).  And this view of good faith is flexible enough to be applied to a Chapter 11 case regardless of complexity.

<u>Valid Reorganizational Purpose</u>

Alas, this conclusion merely creates additional questions.  What is a "valid reorganizational purpose" and what does it mean to "need" Chapter 11 protection?  Various answers to this first question have been articulated.  Most significantly, the United States Supreme Court has held that "preserving going concerns" and "maximizing property available to satisfy creditors" are valid bankruptcy purposes. *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 No. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999).  Closer to home, the court in *Schlangen*, 91 B.R. at 836-37, opined that "Chapter 11 was designed to prevent the waste and reduction in asset values that result from unnecessary liquidation.  Congress meant to encourage financial restructuring and to reestablish efficient business operations with the goals of permitting greater payments to creditors then could otherwise be made while also preserving jobs and shareholders' interests." *Id.* (citing *Victory Constr.*, 9 B.R. at

31

551-65; H.R. Rep. No. 595, 95th Congr., 1st Sess. 220-21 (1977), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5963, 6179*; and *In re HBA East, Inc.*, 87 B.R. 248, 259 (Bankr. E.D.N.Y. 1988)).

One purpose is if the filing would preserve or create some value to the debtor and/or the estate that would be lost outside of bankruptcy. *See Integrated Telecom*, 384 F.3d at 129 and *In re Roman Catholic Church of the Archdiocese of New Orleans*, 632 B.R. 593, 599 (Bankr. E.D. La. 2021). Such a purpose could include the avoidance of liens, the recovery of "preferential" transfers, rejection of contracts, cram-down of claims, or the sale of assets free and clear of liens—tools that may increase value to creditors and the estate which are not generally available outside of bankruptcy. But this purpose presumes the debtor has need to preserve or create value to satisfy creditor claims in full.

<u>"Need" for Chapter 11 Protection or Relief</u>

It follows then that the "need" for Chapter 11 relief is inextricably tied to a bankruptcy "purpose." And this analysis often, if not always, warrants an examination of the debtor's financial condition. Courts have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11. *See SGL Carbon,* 200 F.3d at 166 (citing *In re Marsch,* 36 F.3d 825, 828–29 (9th Cir. 1994); *In re Argus Group 1700*, 206 B.R. 757, 765–66 (E.D. Pa. 1997); *Furness v. Lilienfield (In re Lilienfield)*, 35 B.R. 1006, 1011-13 (D. Md. 1983); *In re Talladega Steaks, Inc.,* 50 B.R. 42, 44 (Bankr. N.D. Ala.1985)). Those courts have recognized that if a petitioner has no

32

need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed. *Id.* (citing *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir. 1985) ("The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state"); S. Rep. No. 95–989, at 9 reprinted in 1978 U.S.C.C.A.N. 5787, 5795 (noting that "Chapter 11 deals with the reorganization of a financially distressed enterprise . . . ")); *see also In re Local Union 722 Int'l Bhd. of Teamsters*, 414 B.R. 443 (Bankr. N.D. Ill. 2009). Put another way, such petitioners have problems that Congress did not design or intend the Code to fix.

Where the debtor is insolvent, a petition will almost invariably be consistent with the objectives of the bankruptcy laws. The filing of a petition implements Congress' scheme of debt priorities and the policy of equal distribution among creditors with the same priority. Where the debtor is solvent, however, we begin to stray from Congress' intended application of the Code and valid bankruptcy purposes dwindle.

This line of reasoning has arguably been most clearly articulated by the Third Circuit in cases like the aforementioned *SGL Carbon* and *Integrated Telecom* and, most recently, in *In re LTL Management, Inc.*, 64 F.4th 84 (3rd Cir. 2023). The *LTL* decision—issued just weeks before the Motions filed here—casts a particularly prominent shadow over Aearo's bankruptcy and warrants a full discussion.

<u>In re LTL Mgmt., Inc.</u>

33

The debtor in *LTL* was formed as a subsidiary of Johnson & Johnson (J&J) on the eve of bankruptcy to resolve J&J's talc-related mass tort litigation. J&J Consumer Inc. ("Old Consumer"), a wholly owned subsidiary of J&J faced, thousands of lawsuits alleging that talc in its "iconic" Johnson's Baby Powder products caused mesothelioma and ovarian cancer. *Id*. at 92-95. Faced with at least 38,000 suits (and the prospect of even more to be filed), mounting payouts and litigation costs, J&J undertook a corporate restructuring (the "Restructuring") under Texas law[18] to deal with its liabilities and minimize harm to the broader corporate group. *Id*. at 95-96. The Restructuring eliminated Old Consumer by splitting it into two new entities: LTL and a newly constituted J&J Consumer Inc. ("New Consumer"). *Id*. at 96. New Consumer would hold almost all the productive businesses of Old Consumer, while LTL would hold all Old Consumer's talc-related liabilities. *Id*. Critically (and, of course, of relevance here), the Restructuring also included a funding agreement that provided LTL funding rights from New Consumer. *Id*. at 96-97. Outside of bankruptcy, the funding agreement gave LTL the ability to cause New Consumer and J&J, jointly and severally, to pay it cash up to the value of New Consumer to satisfy any talc-related costs, as well as its normal-course expenses. *Id*. In bankruptcy, the agreement gave LTL the right to cause New Consumer and J&J, jointly and severally, to pay it cash in the same amount to satisfy its administrative costs and to fund a trust, to be created in a plan of reorganization, to address talc liability for the benefit of existing and future

---

[18] The Third Circuit called the Restructuring a "divisional merger," but many have called it a "Texas Two Step."

claimants.  In either scenario, there were few conditions to funding and no repayment obligation.  LTL estimated that the value of New Consumer, and thus the value of the funding agreement to LTL, was no less than $61.5 billion.  *Id.* at 97.

The bankruptcy court overseeing LTL rejected calls to dismiss the case for bad faith.  *Id.* at 98.  In so doing, the court ruled that the filing served a valid bankruptcy purpose because it sought to resolve talc liability by creating a trust for the benefit of claimants under § 524(g) of the Code.  *Id.*  The court "highlighted what it viewed as several benefits of claims administration thorough a § 524(g) trust, compared to mass asbestos litigation in trial courts, including the possibility it could resolve claims more efficiently (from both a cost and time perspective), ensure more balanced recoveries among claimants, and preserve funds for future claimants."  *Id.*

The court also held that LTL was in "financial distress."  *Id.*  In reaching that conclusion, the bankruptcy court focused on "the scope of litigation faced by Old Consumer (and transferred to LTL), the historic costs incurred by Old Consumer in connection with the talc litigation, and the effect on these costs on its business."  *Id.*  In the bankruptcy court's view "extrapolating this talc liability into the future showed the 'continued viability of all J&J companies [was] imperiled.'"  Id. at 99 (citation omitted).  That said, the bankruptcy court seemed uncertain whether LTL would completely exhaust its payment right under the Funding Agreement.  *Id.*  Finally, the bankruptcy court rejected the argument that LTL's filing was undertaken to obtain an unfair tactical litigation advantage.  Rather, the court

opined that the bankruptcy forum has a superior ability to protect talc claimants'
interests. *Id.*

On direct appeal, the Third Circuit reversed and dismissed the case as
having been filed in bad faith. Relying heavily on Third Circuit precent, the Court
found two inquiries particularly relevant: "(1) whether the petition serves a valid
bankruptcy purpose[;] and (2) whether [it] is filed merely to obtain a tactical
litigation advantage." *Id.* (citing *BEPCP*, 489 F.3d at 618 (citing *Integrated
Telecom*, 384 F.3d at 119-20)). In the Third Circuit's view, valid bankruptcy
purposes include maximizing the value of the debtor's estate and preserving a going
concern. *Id.* In the LTL court's view, a valid bankruptcy purpose "assumes a debtor
in financial distress." *Id.* at 101 (quoting *Integrated Telecom*, 384 F.3d at 128).

In finding bad faith, the Third Circuit distinguished *LTL* from several other
Chapter 11 cases where the debtor faced mass tort litigation. *Id.* at 104. The
debtor in *Johns-Manville Corp.*, 36 B.R. at 730, faced a "tide of asbestos litigation
that, but for its filing, would have forced the debtor to book a $1.9 billion liability
reserve 'trigger[ing] the acceleration of approximately $450 million of outstanding
debt, [and] possibly resulting in a forced liquidation of key business segments."[19]
*Id.* at 729-730. In the case of *A.H. Robins Co., Inc.*, 89 B.R. 555, 558 (Bankr. E.D.

---

[19]  *Johns-Manville* instructs that "[a] 'principal goal' of the Bankruptcy Code is to
provide open access to the bankruptcy process" and that "there should be no legal
barriers to voluntary petitions." *Johns-Manville*, 36 B.R. at 736 (citations omitted).
But even with that, the court cites approvingly to cases finding a lack of good faith
where the debtor was solvent. *Id.* at 750 (citations omitted). In concluding that
Johns-Manville filed its case in good faith, the court found reason to emphasis that
the company was "besieged," and in "desperate need of reorganizing its crushing
debt." *Id.* at 741.

36

Va. 1988), the debtor "had only $5 million in unrestricted funds and 'a financial picture so bleak that financial institutions were unwilling to lend it money.'" *Id*. (quoting *A.H. Robbins*, 89 B.R. at 558). And in Dow Corning's Chapter 11 case, the court described the debtor as "financially distressed," in part because "the legal costs and logistics of defending the worldwide product liability lawsuits against the [d]ebtor threated its vitality by depleting its financial resources and preventing its management from focusing on core business matters." *In re Dow Corning Corp.*, 244 B.R. 673, 676-77 (Bankr. E.D. Mich. 1999). Those factors created a "compelling need [for the debtor] to reorganize in order to meet" its obligations to creditors. *Id*.

The *LTL* court acknowledged that it "cannot predict all forms of financial difficulties that may in some cases justify a debtor's presence in Chapter 11. Financial health can be threatened in other ways; for instance, uncertain and unliquidated future liabilities could pose an obstacle to a debtor efficiently obtaining financing and investment." *Id*. The court further commented that litigation may also result in "serious . . . managerial difficulties." *Id*. (citing *SGL Carbon*, 200 F.3d at 164). In particular, "[m]ass tort cases may present these issues and others as well, like the exodus of customers and suppliers wary of a firm's credit risk."[20]

---

[20]  The Court finds useful commentary on the meaning of financial distress in the context of § 1112(b) from the bankruptcy court's decision in *Archdiocese of New Orleans*:

> [T]he conditions of solvency and experiencing financial distress are not necessarily exclusive of another. One court instructs that the solvency of a debtor is but one factor be considered in determining whether that debtor was experiencing financial distress . . . . In addition to solvency, courts also consider such factors as:
>
> > "[C]ash reserves; recent financial performance and profitability; the proportion of debt owed to insiders;

The Court ultimately finds this logic persuasive.  While the Court would rather frame the issue in terms of a debtor's "need" rather than "financial distress," (lest "financial distress" be interpreted too literally and ignore the Code's lack of an insolvency requirement), the inquiry will often be the same:  are the problems the debtor is facing within the range of difficulties envisioned by Congress when it crafted Chapter 11?  *See Bible Speaks*, 65 B.R. at 424-425.  In addition, a debtor's "need" for relief does not create a bar to seeking bankruptcy relief like "financial distress" seems to do.

<u>Do the Aearo Entities' Cases Serve a Valid Bankruptcy Purpose?</u>

Based on the record before it, the Court cannot conclude that the Aearo Entities' cases serve a valid reorganization purpose.  In reaching that conclusion, the Court first finds that Aearo has been, and currently is, financially healthy.  Its sales have increased over the last few years, notwithstanding the MDL.  Aearo has no reported cash flow problems and timely meets its obligations.  There is no suggestion that any debt has been accelerated or that its access to financial

---

realistic estimates of actual or likely liability; whether a debt is fixed, substantial, and imminent, current cash position or current liquidity; ability to raise capital; and overdue debts or the ability of debts as they become due."

*Archdiocese of New Orleans,* 632 B.R. at 602 (quoting *In re Rent-a-Wreck of Am., Inc.*, 580 B.R. 364, 375-76 (Bankr. D. Del. 2018)).  The Court cites to those factors, not to adopt a multifactor test for "financial distress," but to instead emphasize that an analysis of a debtor's economic condition appropriately encompasses far more than just balance sheet insolvency.  A court should ideally take an expansive view of the debtor's "economic reality."

markets, investment or lending has been impacted by the Pending Actions. Aearo remains a small, profitable enterprise.

While Aearo is a named defendant in the biggest MDL in United States history, it has not, to date, faced execution of any judgment. As of the Petition Date, Aearo had made no contribution to CAEv2-related defense costs. While 3M has not expressly committed to pay these costs in the future, there is no evidence that 3M has threatened to shift responsibility for these costs to Aearo. Any concerns that 3M's litigation support will end absent or outside of bankruptcy are purely hypothetical.

As of the Petition Date, Aearo had not actively participated in the Pending CAEv2 Actions in any meaningful way and, thus, had not faced any operational interruptions or distractions because of them. The Court heard no evidence at the PI or MTD Hearings that there had been any interruption under the SSA based on 3M's own arguably intense involvement in the CAEv2 Actions. While there was some testimony at the MTD Hearing that at least one vendor had expressed concerns about its ongoing business with Aearo, those concerns seemed to stem from the bankruptcy itself and not the MDL. In fact, many of Aearo's vendors reportedly were not even aware of Aearo's involvement in the MDL and potential liability. There is simply no compelling evidence that the Pending Actions have had or will have, at least in the near term, any substantial effect on Aearo's operations. Aearo, simply put, is thriving even while living under the "overhang" of the largest MDL in history.

Of course, the Funding Agreement plays an obvious and significant factor in the Court's conclusion that Aearo is financially healthy. Because of the Funding Agreement, Aearo enjoys an "uncapped and no cost" guarantee—according to Stein's testimony at both the PI and MTD Hearings—that 3M will pay Aearo's creditors in full *regardless of whether Aearo is in bankruptcy*. While Aearo will have to use some of its own assets before making a funding request under the Funding Agreement, in the very least, it will retain $5 million in cash reserves—more than enough to cover its operational costs. Indeed, the Funding Agreement may render the MDL irrelevant to Aearo's operations.

Admittedly, the Court must, as it did in the PI Order, recognize that 3M's ability to honor the Funding Agreement is, itself, not guaranteed. But the Court again looks to Stein's insistence at both PI and MTD Hearings that 3M has the financial wherewithal to honor the Funding Agreement. Recall that the Independent Directors *vigorously* negotiated for the Funding Agreement to remove any bankruptcy contingency. As such, the Court presumes that the Independent Directors weighed the possibility that Aearo's bankruptcy case might be dismissed and felt confident 3M could fund any liability generated by the CAEv2 Actions. Thus, the Court discounts any suggestion that 3M's ability to honor the Funding Agreement depends on resolution of the Pending Actions through a bankruptcy claims process.[21] It is undisputed that as of the Petition Date, 3M was an A-rated,

---

[21] It is important to again emphasize that both Aearo and the CAEv2 Movants concede that even if these cases are dismissed, the only viable resolution of the MDL is through a global settlement. It is unrealistic to expect that 230,000-260,000 cases are going to be tried in our nation's federal courts.

Fortune 500 company with substantial assets and revenue.  The 3M Tower insurance—and the Aearo Legacy insurance for that matter—remain untapped. 3M's continuation of its stock-buyback plans, shareholder dividends, and proposed spin-off of its profitable health care business, do not speak of a company experiencing financial distress.

While the CAEv2 claimants have, in disclosures made within the MDL, estimated 3M and Aearo's liability to be in the trillions, that figure—as counsel for Aearo at the first day hearing argued—is just a lawyer's highly optimistic guess. The verdicts rendered to date are on appeal, as is the issue of whether 3M and Aearo have any liability under a government contractor defense.  It is simply too early to conclude that the MDL is enterprise threatening or will result in the liquidation of either 3M or Aearo.

Clearly, the Pending Actions present the *potential* for great peril to 3M and Aearo.  But as the Court sits here today—before additional verdicts have been rendered, before the appeals have been decided, before either 3M and/or Aearo has been compelled to satisfy any judgment—it simply cannot conclude that either entity is presently in financial distress, even under a generous reading of that term's meaning.  *See LTL*, 65 F.4th at 102 ("Financial distress must not only be apparent, but it must be immediate enough to justify a filing.  An attenuated possibility standing alone that a debtor may have to file for bankruptcy in the future does not establish good faith.") (internal quotations omitted)).[22]

---

[22]  It is the requirement that financial distress must be immediate that leads the Court to give no weight to Dr. J.B. Heaton's expert testimony at the PI Hearing that

While the Court appreciates that uncertainty about potential CAEv2 liability itself has likely caused some disruption to 3M's stock price, risk profile and credit rating, there is no evidence those effects have, to date, seriously threatened 3M's financial condition and its ability to honor the Funding Agreement. And there is virtually no evidence that Aearo's business has suffered any meaningful ill effect because of the Pending Actions.

Second, the evidence presented at the MTD Hearing also shows that there is no material value preserved, created, or lost outside of bankruptcy. Aearo's bankruptcy filing stayed suits against it but was unsuccessful extending that stay to 3M. Nonetheless, litigation against 3M in the MDL is effectively stayed pending resolution of appeals. But 3M has continued to defend the CAEv2 Actions after the Petition Date, and almost assuredly will continue to do so if Aearo's bankruptcy is dismissed given that 3M has joint and several liability at best, and sole liability at worst, on the CAEv2 Actions. And most importantly, Aearo can use the Funding Agreement inside or outside of bankruptcy to make a funding request of 3M for any liability, direct or through indemnification of 3M, resulting from the CAEv2 Actions.

Absent the bankruptcy, the Respirator Claims would be allowed to proceed. However, Aearo has already reserved funds to satisfy its estimate of valid Respirator Claims and has an indemnity agreement with a co-defendant for any

---

3M's liability for the CAEv2 Actions may be at least $100 billion. This testimony was based upon the bellwether trial results and the CAEv2 Actions being dismissed or fully litigated. But as of the Petition Date, the bellwether verdicts were on appeal and the initial waves of CAEv2 trials had not yet occurred. Dr. Heaton's figure is just a possibility at this point.

liability ultimately assessed. This is on top of Aearo's access to the Funding Agreement, inside or outside of bankruptcy, to fund any liability arising from the Respirator Actions. So, while Aearo does benefit from the stay with respect to the Respirator Actions, that value is minimal given its indemnification by a co-defendant and its access to the Funding Agreement, both of which exist inside and outside of bankruptcy.

Aearo has consistently contended, and the CAE Movants appear to now concede, that the only realistic way to resolve the CAEv2 Actions and the MDL is via settlement. Aearo elicited compelling expert testimony by Dr. Charles Mullin of Bates White that the Code provides excellent tools and means to effectuate the settlement of large tort claims. This, standing alone, might constitute value that doesn't exist outside of, or might be lost without, bankruptcy. But it does not stand alone. The CAE Movants elicited equally compelling expert testimony by Matthew Garretson of Wolf Garretson that settlements of personal injury claims can be successfully accomplished in an MDL. Both forums can implement a settlement agreement, either through a Master Settlement Agreement in the case of an MDL or a plan in the case of a Chapter 11 bankruptcy.

As noted in the PI Order, neither forum is perfect. The biggest issue in any settlement will be opt-out claimants. A 99% opt-in rate in either forum would still leave between 2,300-2,600 CAEv2 Actions unresolved, a number which, on its own, would rank as the fifteenth largest MDL currently pending.[23] But the Court

---

[23] This ranking comes from the United States Judicial Panel on Multidistrict Litigation May 15, 2023 MDL Statistics Report,

received no evidence whether opt-outs could be handled better or more efficiently inside or outside of a Chapter 11 bankruptcy.  And the Court believes that the opt-out problem will be a significant hurdle in either forum.  Based on the foregoing, the Court cannot conclude that Aearo's bankruptcy creates or preserves any value that would be lost if these cases were dismissed.

From the very beginning of these cases, Aearo made clear that the filings were not prompted by concerns over financial distress or impending insolvency but were initiated to manage the MDL process, a process that Aearo insisted was "broken."  These cases were and are a litigation management tactic and not a rehabilitative effort.  The Court does not fault Aearo for this gambit; unlike LTL (and other Texas Two-Step cases), Aearo is a real company with real debts. *See Johns-Manville*, 36 B.R. at 737.  The number of CAEv2 Actions is significantly larger than any previous MDL, and it is not bad faith as a matter of law to file a Chapter 11 with the hope of achieving a settlement with creditors.  *In re Hall*, 304 F.3d 743, 747 (7th Cir. 2002).  But unlike the debtors in *Johns-Manville*, *Dow Corning,* and *A.H. Robins*, Aearo is not presently suffering financial problems of the type that warrants Chapter 11 relief.  Nor is Aearo creating or preserving value in these cases that would be lost outside of bankruptcy.

There is also nothing before the Court to suggest that the Aearo Entities' filings serve creditors, as the cases will not necessarily augment their recovery.  Per the terms of the Funding Agreement, 3M is committed to pay all valid claims in full

---

http://www.jpmd.uscourts.gov/jpml/files/Pending_MDL_Dockets_By_Actions_Pending-May-15-2023.pdf.

inside or outside of Aearo's bankruptcy.  It is also telling that both committees in these Chapter 11 cases, as well as the UST, have moved to dismiss these cases or appoint a Chapter 11 trustee.  If there is a benefit to creditors in these Chapter 11 cases, it is an unwanted one.

As such, the Court must conclude that cause exists under § 1112(b) of the Code to dismiss these cases. Additionally, the passionate opposition to these Chapter 11 cases by the Movants, coupled with the lack of any evidence that dismissal of these Chapter 11 cases is not in the best interests of creditors, makes 1112(b)(2) inapplicable.  In reaching that conclusion, the Court also rejects Aearo's argument that the Motions are barred by the doctrine of laches.

<u>Laches</u>

The doctrine of laches applies when there is: (1) delay in the assertion of a claim; (2) the delay is inexcusable; and (3) undue prejudice results from the delay. *In re NNN 123 North Wacker, LLC*, 510 B.R. 854, 861 (Bankr. N.D. Ill. 2014) (citing *Geyen v. Marsh*, 775 F.2d 1303, 1310 (5th Cir. 1985)).  Here, the Court does not find the Movants' "delay" in seeking dismissal under § 1112(b) to be "inexcusable."

These cases were filed on July 26, 2022, as was Aearo's request for injunctive relief, which dominated the first two months of these cases.  In the ensuing months, there have been several contested hearings, including objections to Aearo's retention of K&E as counsel, for the use of mediation within the cases and in coordination with mediation in the MDL, and on the Aearo Entities' multiple requests for extensions of their exclusive right to file a plan.  The parties have also

been actively engaged in mediation and in several pending appeals, including Aearo's appeal of the PI Order.

Given this activity, the Court is hard pressed to conclude that the Movants' delay in raising this issue was unreasonable or that Aearo was prejudiced by that delay.  The Court again notes that both Aearo and 3M have largely enjoyed a cessation of Pending Actions during this period, notwithstanding the PI Order, which has presumably allowed them to focus on settlement discussions.  For these reasons, the Court declines Aearo's request to invoke laches.

<u>Appointment of a Chapter 11 Trustee</u>

The Court also declines the Respirator Committee's request to appoint a Chapter 11 trustee.  As quoted previously, the Court must dismiss a Chapter 11 case upon a showing of "cause" unless the Court finds the appointment of a trustee is in the best interest of the creditors and the estate.  11 U.S.C. 1112(b)(1).  The Court does not agree that the appointment of a trustee is in the best interest of the creditors or the estates here.

The Respirator Committee argued at the MTD Hearing that there is a "3M problem" in this case.  In the Respirator Committee's view, the Aearo Entities' bankruptcy cases were filed at 3M's direction and for its benefit and that Aearo's interests (and the interests of its creditors) have not been well served.  As an example of this, the Respirator Committee cites to Aearo's apparent refusal to collect the $640 million receivable from 3M.  The Respirator Committee insists that

46

that the appointment of a trustee will help bring these cases to a consensual resolution.

The Court does not disagree that 3M heavily influenced Aearo's filing, but that's hardly surprising given that Aearo is 3M's wholly owned subsidiary.  But the Court does disagree that that the appointment of a trustee will necessarily change that dynamic—at least not enough to warrant the appointment of a trustee.  The fact remains that 3M is Aearo's parent company, one of its biggest customers, provider of most of Aearo's "back office" functions, the sole funding source under the Funding Agreement, and a co-defendant in the Pending Actions.  Even a trustee will be hard pressed to navigate these Chapter 11 cases without following in 3M's wake for much of the journey.

The Court also has no reason to believe that that a consensual resolution cannot be obtained—at least from a structural standpoint—outside of bankruptcy. The Court heard from two experts during the MTD Hearing who testified as to the relative merits of the bankruptcy and MDL resolution and claims processes.  The Court repeats its observation in the PI Order that "[These cases are] . . . not a debate as to the relative merits or demerits of the MDL and bankruptcy processes. Both are merely tools, engineered by Congress, for the adjudication and resolution of claims.  Neither is perfect and each present both risk and reward for the various constituencies."  The Court's belief remains unchanged.  The parties' mediation efforts both here and in the MDL have been guided by experienced and trusted

47

mediators.  There is little reason for this Court to believe that a trustee will necessarily add to or aid the process of reaching a global settlement.

Finally, the Court disagrees, at least here, that the appointment of a trustee is an appropriate remedy under § 1112(b)(1) when the identified "cause" is a lack of good faith.  The appointment of a trustee does not ameliorate or obviate the fundamental problem that these cases simply do not, at least presently, serve a valid reorganizational purpose.

For the above reasons, the Court **DENIES** the Respirator Committee's request for the appointment of a Chapter 11 trustee.

## Conclusion

The Court denied Aearo's PI Motion largely over concerns that Aearo's request to extend the automatic stay to a nondebtor—at least without establishing a financial impact on the estate if the stay was not extended—exceeded its jurisdictional limits.  Those same concerns inform this decision.  Admittedly, § 1112(b) is not itself jurisdictional, but requiring a valid bankruptcy purpose and a debtor in need of bankruptcy relief protects this Court's jurisdictional integrity.  Otherwise, a bankruptcy court risks becoming another court of general jurisdiction, which it most decidedly is not.  Absent a Congressional intervention that clarifies if, when, and under what circumstances debtors involved in mass tort litigation may file for bankruptcy, the Court is unwilling to ignore that the Aearo Entities—at

48

least presently—enjoy a greater degree of financial security than warrants bankruptcy protection.[24]

In this Court's view, allowing an otherwise financially healthy debtor with no impending solvency issues to remain in bankruptcy, much less one whose liability for most of its debts is supported by an even more financially healthy, Fortune 500 multinational conglomerate, exceeds the boundaries of the Court's limited jurisdiction. Accordingly, the Court is compelled to **GRANT** the Motions *without prejudice*.

The Court concedes that the slope here is exceedingly steep and slippery. Aearo and 3M will face significant waves of litigation upon dismissal that, unless resolved by agreement, could rapidly and unequivocally present a significant change in circumstances. This decision is not intended to forestall a repeat filing of Aearo—or an initial filing by 3M for that matter—should the circumstances warrant it. But sitting here today and considering the evidence presented by the parties, the Court simply cannot conclude that the Aearo Entities' petitions were anything but fatally premature. For this reason, the cases are, as a group, hereby **DISMISSED**.

###

---

[24] Were Congress to so intervene and expand § 524(g) beyond asbestos cases, bankruptcy would become a more suitable alternative for resolving mass tort cases. Until then, such cases will likely remain problematic under the Code in the face of creditor opposition.